McDEVITT & STREET COMPANY,
Plaintiff,

v.

MARRIOTT CORPORATION,
Defendant.

Civ. A. No. 88–0102–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

May 1, 1989.
As Amended May 18, 1989.

Thomas H. McGrail, Arlington, Va., Edward Graham Gallagher, Washington, D.C., Michael E. Utley, McDevitt & Street Co., Charlotte, N.C., for plaintiff.

Andrew D. Ness, Robert M. Moore, Morgan Lewis & Bockius, Washington, D.C., for defendant.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

ELLIS, District Judge.

This diversity construction dispute grows out of a contract ("Contract") dated January 31, 1986, in which plaintiff, McDevitt & Street Company ("McDevitt"), agreed to construct for defendant Marriott Corporation ("Marriott") a "Courtyard by Marriott" hotel in Herndon, Virginia. In return, Marriott promised to pay McDevitt a total of $4,946,668.[1] The Contract imposed a strict time deadline: McDevitt was re-

---

1. The original price was $4,603,829. Seven subsequent changes in the contract increased this amount to $4,946,668.

quired to complete construction so that Marriott could receive a permanent Certificate of Occupancy and accommodate guests within 330 days from the Marriott-designated start date. The Contract's date for commencement of work was January 24, 1986, and the completion date was, accordingly, December 20, 1986. Lamentably, the road to completion was littered with delays, disputes and alleged plan alterations. In the end, McDevitt did not meet the contractual deadline. Marriott did not receive the equivalent of a permanent Certificate of Occupancy until approximately May 1, 1987, almost nineteen weeks after the scheduled completion date.

Allocating blame for the numerous delays and alleged alterations is the heart of this suit. Throughout the construction period, McDevitt periodically submitted to Marriott both formal and informal proposals for time extensions due to delays ostensibly beyond McDevitt's control and compensation for work performed allegedly exceeding the contractual requirements. Eight of those proposals were denied and are at issue here. Marriott holds McDevitt solely responsible for all delays and alleged additional work under the explicit terms of the Contract and has withheld from McDevitt $450,175 of the contract price. McDevitt, for its part, disclaims responsibility, alleging the delays were excusable or, in some cases, the primary fault of Marriott. On January 29, 1988, McDevitt filed this suit, seeking recovery of the retained payment, reimbursement for alleged extra work, prejudgment interest, and time extensions for allegedly excusable construction delays. As grounds for recovery, McDevitt alleges that Marriott has breached the Contract or, in the alternative, has been unjustly enriched. Marriott then filed a counterclaim against McDevitt, seeking contract damages for the delay in the hotel's completion.

Trial in this case commenced on August 16, 1988 and spanned five days. Twelve witnesses testified. Their testimony filled seven transcript volumes, totaling more than 1000 pages. More than 300 exhibits were admitted. At the conclusion of trial, the parties, at the Court's direction, submitted an agreed outline of the disputed issues. Their proposed findings of fact and conclusions of law with respect to each issue conformed to that outline, as do these findings and conclusions. In a nutshell, the remaining disputes fall into three general categories: (1) McDevitt's claims for additional compensation, (2) McDevitt's claims for time extensions for excusable delays; and (3) Marriott's counterclaim for damages. The Court's findings of fact and conclusions of law, made pursuant to Rule 52(a), Fed.R.Civ.P., correspond generally to the parties' outline.

## I. McDEVITT'S CLAIMS

In this suit, McDevitt alleges that it performed work beyond the contractual requirements for which it has not been compensated. To satisfy this claimed debt, McDevitt seeks enforcement of a perfected mechanic's lien against Marriott's hotel in the amount of $1,224,760, with prejudgment interest. *See* Va.Code Ann. § 43–1 *et seq.* (1986). McDevitt's claims for additional compensation focus on the following eight proposals.

### A. *Additional Compensation*

1. Proposal No. 9—Soils Problems

a. FINDINGS OF FACT [2]

On July 31, 1986, McDevitt submitted Proposal No. 9 in writing to Marriott, seeking a fifty-six day time extension and additional compensation for corrective work allegedly necessitated by poor soil conditions on the Project site. (PX 30). Specifically, Proposal No. 9 alleged that an unusually high level of precipitation during January

---

**2.** Throughout these Findings, references to plaintiff's and defendant's exhibits will be denoted by "PX" and "DX," respectively, followed by the exhibit number and page citations, where appropriate. When an exhibit contains multiple pages, memoranda, or letters, the Court's cita-

tion will identify, to the extent possible, the specific item or page to which the citation refers. References to the trial transcript are identified by the last name of the witness followed by transcript page number.

and February of 1986 had left the construction site too wet to perform the work required by the Contract. Marriott did not grant McDevitt's request. As a result, McDevitt claims that it had to accelerate its performance and perform additional, extracontractual work in order to meet the Contract deadline. This additional work included stockpiling cut soil on the site; laying stone for temporary roads and drains; digging test pits to determine soil moisture levels; aerating and spreading soil to dry; raking soil to remove roots; over-excavating footings; backfilling over-excavated footings with lean concrete; building structural slabs; removing, backfilling and grading soils removed from over-excavated footings; and the attendant overtime work required of McDevitt's and its subcontractors' employees. For this work, McDevitt now seeks $266,828 in additional compensation.

(i) Compensation for Additional Work due to Soil Conditions

McDevitt first asserts that Marriott, in effect, misled them with respect to the actual condition of the soils on the Project site by failing to provide McDevitt a second soils report which allegedly presaged the problems later encountered by McDevitt. The evidence contradicts this assertion.

Before accepting bids on the Project, Marriott retained Geosystems of Virginia, Inc. to prepare a subsurface geotechnical investigation report (the "Geosystems" report) for the Project site. Marriott provided McDevitt a copy of that report (the "Geosystems" report) dated July 1, 1985. (PX–2; DX–35; Barry, Tr. at 121). This occurred prior to McDevitt's submission of its bid on the Project. The Geosystems report described the soil underlying the topsoil layer in the Project area as consisting of three types: Stratum I, extending two to three feet below the topsoil, was primarily plastic clays, susceptible to shrinking or swelling, depending on moisture levels, and silt; Stratum II, below Stratum I and up to ten feet below the surface soils, consisted of silty sands and sandy silts; and Stratum III, located below Stratum II, was decomposed rock. (DX–

35, at 3–4). The Geosystems report recommended that all Stratum I soils be removed from the site because they were unsuitable for use under foundations, pavements or grade slabs, or as compacted fill. (DX–35, at 5; Barry, Tr. at 75). Stratum II soils, however, were considered suitable for use as structural fill, provided they had the right moisture level for adequate compaction. (Drumheller, Tr. at 143–44). The Geosystems report also recommended a number of preventive and corrective measures to ensure proper soil moisture levels during site preparation. (DX–35, at 5–8). Importantly, the report warned that the contractor might need to dry soils during wet weather or dampen soils during dry weather to achieve the required minimum compaction level. The Contract defines the minimum compaction level as "at least 95% of the standard Proctor maximum dry density within 2% of the optimum moisture content determined from the Proctor density test." (DX–35, at 7; see also PX–2, Specs., Section 02200, Part 3.04(B)(4) and (C)(4)).

Marriott had in its possession, but did not provide to McDevitt, an earlier soils report prepared in June, 1983, by Law Engineering Testing Co. (the "Law Engineering report"). (DX–36). In that report, Law Engineering warned that "[t]he soils of Stratum II are marginal for compacted fill.... It is anticipated that drying of these soils to allow compaction will be time prohibitive. If any substantial amounts of compacted fill are required, we expect fill material will have to be imported from off-site." (DX–36 at 7). McDevitt suggests that had it been aware of this report, it would have made adjustments in time and costs for the additional work necessary to haul in off-site fill to replace the on-site Stratum II soil in fill areas. (Barry, Tr. at 79–80). Contrary to McDevitt's assertion, however, the conclusions of the Geosystems report and the Law Engineering report were not, in fact, inconsistent. Rather, the Law Engineering study analyzed an area almost double the size of this Project site, and its summary conclusions were based on test results from the entire area. (Drumheller, Tr. at 166–67). Importantly,

the Law Engineering results relating to the Marriott Project site areas were incorporated in the Geosystems report by Joe Drumheller, a Geosystems geologist. (Drumheller, Tr. at 167). Also significant is that the actual conditions of the soils encountered on the Project site were fully anticipated in the Geosystems report. (Drumheller, Tr. at 180). In any event, Marriott, in the Contract Specifications, expressly disclaimed "any responsibility for the [Geosystems] data as being representative of the conditions and materials which may be encountered.... Test results are made available to interested parties solely as a matter of convenience and general information." The Specifications further assert that "[n]o claim shall be entertained for conditions found to different from those discovered during testing." (PX-2, Specs., Section 02010, Part 1.03(A); Barry, Tr. at 120). Marriott also encouraged all bidders on the Project to make their own independent examinations, tests, and exploratory borings to determine the nature of the soil conditions underlying the Project site. (PX-2, Specs., Section 02010, Part 1.02(B); Barry, Tr. at 120). McDevitt chose not to do so. (Barry, Tr. at 100).

(ii) Compensation for Additional Work due to Weather Conditions

McDevitt also claims that adverse weather conditions during crucial beginning phases of construction substantially delayed construction. McDevitt began work under the Contract on January 24, 1986. (Sheats, Tr. at 185). From January 24 until February 28, 1986, McDevitt alleges that precipitation and snowfall were greater than the average levels during the same period from 1963 to 1985. National Oceanic and Atmospheric Administration (NOAA) records for 1986 indicate that in the pertinent 36-day period, there were a total of 19 days of measurable precipitation, 12 of which involved snow. (PX-24; see also PX-144; PX-145 [McDevitt's Daily Report Summaries]). In contrast, the mean number of days with precipitation for the same period from 1963 to 1985 was 11.6, of which only 2.1 days involved a measurable level of snowfall. (PX-23). For the remainder of the claimed delay period, McDevitt asserted that site conditions were too wet as a result of the previous rain or snowfall.

By letter dated March 28, 1986, McDevitt requested a 28-day time extension, pursuant to Article 7(A) of the Contract's General Conditions, due to unusually heavy precipitation "not reasonably anticipated" from January 24 through March 24, 1986. (PX-30, Letter of 3/28/86 from Steven Rea to Jack Body; DX-19; see PX-2, Gen'l Conditions, Art 7(A)). No weather data supporting McDevitt's assertion of a 9-day average was submitted. (Body, Tr. at 663-665). On May 29, 1986, Marriott requested documentation supporting the requested time extension, including as (1) an analysis of the months April and May 1986 to ascertain whether there was less than normal precipitation during those months; (2) documentation of the "average" rainfall during the relevant time period; and (3) substantiation that the weather actually delayed the Project's critical path. (DX-20). McDevitt did not produce any such documentation. Marriott never granted the March 28 request.

On July 31, 1986, McDevitt requested an additional 28-day time extension for "corrective work required due to poor soils conditions." (PX-30). McDevitt did not assert any contractual basis for this additional time extension request. (PX-30; Body, Tr. at 669). Marriott denied this request by letter dated August 29, 1986. (DX-51). Jack Body, Marriott's Project Manager, noted in that letter that his own review of records for the January 24 to March 24 period for the past five years did not suggest that excessive adverse weather was a significant factor in the delays. (DX-51; Body, Tr. at 665-66, 747, 752).

The Court accepts the opinion testimony of Marriott's expert witness, Mr. Rodgers, that, based on a review of NOAA records, the weather conditions encountered by McDevitt during January 24 to March 24, 1986, could have been "reasonably anticipated," and were no more severe than the normal weather conditions for the area at that time of year. (Rodgers, Tr. at 855-59). Specifically, Rodgers concluded that

the total level of precipitation during the 1986 time period was 13% below normal when compared to the previous five years, and 29% below normal compared to the past twenty-four-year average. (Rodgers, Tr. at 856–57). Moreover, during the January 24 to March 24, 1986 time period, there were 13 rain days with a minimum of 0.1 inch of rainfall, compared to the average 12 rain days occurring during the past five years.

As a result of Marriott's denial of these requests for time extensions, McDevitt claims that it had to accelerate its work schedule in order to meet the Contract deadline. It is, however, uncontested that the weather conditions complicated the initial phases of construction. The chief complication is that the soil became too wet to meet the 95% compaction rate. But significantly, McDevitt also failed to take several steps which may have alleviated or prevented the problems attributable to moisture. A McDevitt subcontractor, A.G. Van Metre, Jr. Construction Co. ("Van Metre"), for example, stripped the topsoil layer when it was wet, leaving a muddy mixture of topsoil and underlying soil in its wake. This was contrary to the Specifications. (Sheats, Tr. at 233; see PX–2, Specs., Section 02200, Part 3.02(G)(1)). And, again contrary to the Specifications, McDevitt failed during that period to maintain an adequate dewatering program or to "proof-roll" over site areas receiving fill material. (Drumheller, Tr. at 163; Sheats, Tr. at 250; see PX–2, Specs., Section 02200, Part 3.02(D) and (H)). These measures might well have prevented or ameliorated the soil moisture problem. From January 24 until February 18, 1986, Van Metre cleared the trees from the Project site. (Sheats, Tr. at 186; PX–144; PX–145; PX–159; PX–160). At that time, however, the site was too muddy for McDevitt to roll it or to use a rake to clear tree roots. (Sheats, Tr. at 187–89; PX–143, Marriott Weekly Reports No. 01, 02).

On March 14, Mr. Drumheller, a Geosystems employee under contract to Marriott, submitted to McDevitt written recommendations on how to deal with the wet site conditions. (DX–37; Drumheller, Tr. at 149–50). He offered four suggestions: (1) stop work for two months; (2) undercut and haul away the wet soil, replacing it with off-site dry fill; (3) place a geotextile fabric over the wet soils and add fill on top of the fabric; or (4) dry the soil by discing, aerating, and rolling it. (Drumheller, Tr. at 149–50). McDevitt and Marriott collectively determined that the fourth option, drying the soil, was the most practical choice. (Drumheller, Tr. at 153–57; Sheats, Tr. at 200). Drumheller estimated that under this option, it would take two to three months to dry the soil sufficiently to achieve the required 95% compaction. (DX–37; Drumheller, Tr. at 155–56).

In a subsequent meeting with McDevitt representatives, Body, Marriott's Project Manager, also agreed to relax the 95% compaction requirement in the area designated for a parking lot. (Drumheller, Tr. at 158–60, 162–63). The relaxed compaction requirement, in effect, decreased the time required to complete work in that area of the Project. (Drumheller, Tr. at 158). Contrary to McDevitt's assertion, however, it is clear from the record that Marriott did not authorize relaxation of the 95% compaction in the building area. (Drumheller, Tr. at 162; Body, Tr. at 760–62; DX–344 [Peters Dep. Tr., at 371–73]). With the exception of Sheats' testimony at trial, (Sheats, Tr. at 202–03), which contradicted his pretrial deposition testimony, (Sheats, Tr. at 242–45), the evidence clearly indicates that the relaxation of the 95% compaction standard applied only outside the building area. In fact, Sheats himself signed the contemporaneous minutes of a meeting between Marriott and McDevitt representatives on this issue that explicitly noted, "Marriott has relaxed 95% compaction [2 feet] below subgrade outside the building area." (DX–28; see also PX–43). By letter dated March 28, 1986, Marriott's Project Manager, Jack Body, confirmed to McDevitt that Marriott had agreed to relax the compaction requirements "at the lower elevations," but expressly noted that this modification

does not release McDevitt and Street from its contractor obligations. The re-

quired compaction at given elevations, for the slabs on grade, and footings on parking lot are still the responsibility of McDevitt and Street. I see no reason for Marriott to pay for any undercutting or surge stone in any footings.

(DX–29). Further support for this conclusion is furnished by the applicable building codes. They clearly required 95% compaction in the building area. (Sheats, Tr. at 245; DX–40 [Minutes of meeting between Sheats, Leake, and a structural engineer who inspects on behalf of Fairfax County]). Marriott, therefore, did not relax, and did not have the authority to relax, the 95% compaction standard in the building area.

McDevitt proceeded to disc, aerate, compact and grade the site in accordance with the relaxed requirements. On April 2, the site was ready for the requisite footing work. (PX–147 [Daily Report of 4/2/86]; PX–162 [Matrix Inspection Report of 4/2/86]). At the north end of the buildings, the top layer of virgin soil was still too wet to meet the Contract and Town of Herndon's soil compaction requirements. (Sheats, Tr. at 217–18). In order to meet these requirements, McDevitt excavated the footings below the design grade toward the north end of the site and then partially filled the excavation with concrete up to the design grade. (PX–162 [Matrix Inspection Reports of 4/2/86, 4/3/86]). Another change was also necessary to meet the Contract compaction standard. The proposed slab-on-grade at the north end of buildings A and C had to be replaced by a more costly structural slab designed by the Project's structural engineer, Meyer Associates. (Sheats, Tr. at 218–20).

On July 31, 1986, in conjunction with its request for a 28–day time extension, McDevitt also sought an additional $281,-763 for (1) undercutting unsuitable soils on the north end of the site, at the direction of Marriott and its agents; (2) digging additional test pits at the direction of Matrix Construction Management, Inc. ("Matrix"), Marriott's soils consultant; (3) aerating the soil; (4) overexcavating footings; (5) sub-stituting structural slabs for original slab-on-grades; and (6) expediting the schedule to compensate for lost time due to poor weather conditions. (PX–30).

The Contract makes clear that the strict time schedule for completion set forth by Marriott is essential to the Contract. Specifically, Article 3.3 emphasizes that "TIME IS OF THE ESSENCE OF THIS AGREEMENT.... Contractor shall begin its Work at the time specified by Owner and perform its Work with diligence and sufficient manpower to maintain the progress of the Work." (PX–2, Contract, Art. 3.3) (emphasis in original). This provision was never waived, modified or relaxed. The Contract also warns that "Contractor shall not allow reasonably foreseeable weather conditions to impede the progress of the Work and shall provide and maintain all temporary weather protection, pumping facilities and snow, ice, mud or water removal services necessary to maintain the Progress of the Work." (PX–2, Gen'l Conditions, Art. 6(A)). Extensions of time are expressly allowed for construction delays "[i]f the Contractor is delayed or hindered at any time in the progress of the Work by any act or neglect of Owner or by any contractor employed by Owner, or by changes ordered in the scope of the Work, or by fire, adverse weather conditions not reasonably anticipated, or any other causes beyond the control of the Contractor." (PX–2, Gen'l Conditions, Art. 7(A)). But Marriott disclaimed any liability on the basis of the "no damage for delay" clause in the Contract. (PX–2, Gen'l Conditions, Art. 7(A)). The Contract further notes that the "Contractor shall not allow reasonably foreseeable weather conditions to impede the progress of the Work and shall provide and maintain all temporary weather protection, pumping facilities and snow, ice, mud or water removal services necessary to maintain the Progress of the Work." (PX–2, Gen'l Conditions, Art. 6(A)). A time extension is allowed only for "adverse weather conditions not reasonably anticipated...." (PX–2, Gen'l Conditions, Art. 7(A)).

### b. CONCLUSIONS OF LAW [3]

#### (i) Compensation for Additional Work due to Soil Conditions

█ The Court's guidepost in determining the legal responsibilities of the parties at bar is the Contract itself. The Contract, unless it is illegal or violates public policy, constitutes the law that governs the parties' relationship. *Chantilly Construction Corp. v. John Driggs Co.*, 45 B.R. 297, 306 (Bankr.E.D.Va.1985); *Bob Grissett Golf Shoppes, Inc. v. Confidence Golf Co.*, 44 B.R. 156, 159 (Bankr.E.D.Va.1984); *Russell County v. Carroll*, 194 Va. 699, 703, 74 S.E.2d 685, 687–88 (1953). In Virginia, it is settled beyond question that "where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Globe Company v. Bank of Boston*, 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965). *Accord Ross v. Craw*, 231 Va. 206, 343 S.E.2d 312, 316 (1986); *McLean House, N., Phase I v. Maichak*, 231 Va. 347, 344 S.E.2d 889, 890 (1986); *Coverstone Land Ltd. Partnership v. McKeon Construction Co.*, 216 Va. 6, 216 S.E.2d 11, 13 (1975). Here, the Contract is clear and unambiguous: it explicitly places the risk of unanticipated soil conditions squarely on the contractor. (*See* PX–2, Specs., Section 02010, Parts 1.02(B) and 1.03(A)). The fact that Marriott provided McDevitt, and all other bidders, a copy of a soils report on the Project site does not shift this risk to Marriott. Rather, Marriott provided the soils report "solely as a matter of convenience and general information," (PX–2, Specs., Section 02010, Part 1.03(A)), and expressly disclaimed "any responsibility for the data as being representative of the conditions and materials which may be encountered." (PX–2, Specs., Section 02010, Part 1.03(A)). The Contract, in fact, expressly omits the report from the Contract documents, encourages bidders to conduct their own soil and subsurface investigations, and expressly bars claims based on soil conditions differing from those presented in the Geosystems report. (PX–2, Specs., Section 02010, Parts 1.02(B), 1.03). The parties, through the Contract, could not have been clearer in expressing their intent that the risk of differing soil conditions remained on the contractor. In choosing not to conduct its own soil tests and, instead, relying on the Geosystems report when preparing its bid, McDevitt assumed the risk that the actual soil conditions would be different from those reported. *Cf. Anderson*, 569 F.Supp. at 142 (contractor assumes risk of not being able to perform the contract for the amount of his bid). Given these facts, there is no persuasive reason to shift to Marriott the burden of accommodating the soil conditions on the Project site. Under the explicit terms of the Contract, McDevitt is not entitled to additional compensation simply because the actual soil conditions created unforeseen difficulties. *See Anderson v. Golden*, 569 F.Supp. 122, 142 (S.D.Ga.1982) [citing *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918) and *Jefferson Construction Co. v. United States*, 392 F.2d 1006, 1007, 183 Ct.Cl. 720 (1968), *cert. denied*, 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed.2d 113 (1968)]. *Cf. Ballou v. Basic Construction Co.*, 407 F.2d 1137, 1141 (4th Cir.1969) (" '[I]f performance is rendered merely difficult or burdensome or unprofitable, the promisor is not excused.' ") [quoting *Lehigh Portland Cement Co. v. Virginia S.S. Co.*, 132 Va. 257, 111 S.E. 104, 108 (1922)]; *Flippin Materials Co. v. United States*, 312 F.2d 408, 415–16, 160 Ct.Cl. 357 (1963) (Where, by the terms of the contract, "the risks of mistakes as to subsurface materials were deliberately placed on the [contractor,] in the absence of misrepresentation the contractor was to be bound by what he met during performance."); *Eastern Tunnel-*

---

**3.** In this diversity case, this Court must apply Virginia law, including its choice of law principles. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Equitable Trust Co. v. Bratwursthaus Mfg. Co.*, 514 F.2d 565, 567 (4th Cir.1975). Here, the Contract explicitly adopts the law of the state where the Project is located, in this case, Virginia. (PX–2, Gen'l Conditions, Art. 47). The parties do not challenge this provision, nor is the Court aware of any reason not to honor the parties' choice.

*ing Co. v. Southgate Sanitation District*, 487 F.Supp. 109, 113 (D.Colo.1979) ("[T]he mere showing of subsoil conditions unexpected by either party does not automatically release the contractor from his obligations under the contract").

In any event, the condition of the soils underlying the Project site should reasonably have been anticipated by McDevitt. Testimony by McDevitt's own expert witness, Drumheller, confirmed that the soils actually found were not significantly different in nature or character from those analyzed in the Geosystems report. Nor were they significantly different from those analyzed in the earlier Law Engineering report, the relevant portions of which were included in the Geosystems report given to McDevitt. McDevitt, therefore, must bear the financial burden of the extra work.

(ii) Compensation for Additional Work due to Weather Conditions

■ The Contract also explicitly places the risk of anticipatable weather conditions on the contractor. (PX–2, Gen'l Conditions, Art. 7(A)). Extensions of time are authorized only for delays caused "by any act or neglect of Owner or by any contractor employed by Owner, or by changes ordered in the scope of the Work, or by fire, adverse weather conditions not reasonably anticipated, or any other causes beyond the control of the Contractor." (PX–2, Gen'l Conditions, Art. 7(A)). The central issue, therefore, is whether the time delays were the direct result of "adverse weather conditions not reasonably anticipated, or any other causes beyond the control of the Contractor." The Court concludes they were not. First, the weather data provided by McDevitt does not demonstrate that the higher levels of precipitation for the relevant time period could not have been reasonably anticipated by McDevitt. It should have come as no surprise to McDevitt that it rains and snows a good deal during the winter in northern Virginia. And the rain and snowfall in the winter of 1986, even assuming *arguendo* they were greater than the mean for the preceding twenty-year period, was far from the highest recorded and not so unusual as to have been beyond reasonable anticipation. The precipitation levels, therefore, were reasonably anticipatable by McDevitt.

Second, McDevitt has not alleged that any outside factor other than the adverse weather caused the delays for which it seeks time extensions. Weather conditions do not fall within the contractual exception for "other causes" beyond McDevitt's control. Because the Contract specifically mentions "adverse weather conditions", the subsequent phrase "other causes" doubtless refers to causes other than those previously enumerated, including weather conditions. Moreover, while McDevitt does not control the weather, Marriott has pointed to specific precautionary measures McDevitt could have taken to minimize the adverse effects of precipitation. In some instances, these preventive or mitigating measures were contractually required. Yet McDevitt chose not to take these actions. This failure to prevent or mitigate the effects undercuts its claim for excusable delay. The delays resulting from the adverse weather conditions are not, therefore, excused.

■ McDevitt's claim that Marriott's denial of time extensions for the adverse weather constituted a constructive acceleration of Contract work similarly must fall. In construction contracts, a contractor may only recover for the increased costs of acceleration if it can establish three predicates: "(1) that any delays giving rise to the order were excusable, (2) that the contractor was ordered to accelerate, and (3) that the contractor in fact accelerated performance and incurred extra costs." *Norair Engineering Corp. v. United States*, 666 F.2d 546, 548, 229 Ct.Cl. 160 (1981). Here, McDevitt failed to satisfy the first criterion; the delays were not excusable. McDevitt is, therefore, not entitled to recover any additional costs incurred in trying to maintain the original construction schedule. In sum, McDevitt is not entitled to any delay for the effect of adverse weather conditions on the Project site soils.

2. Proposal No. 10—Undercutting North End of Site and Replacing Unstable Soil with Stone

### a. FINDINGS OF FACT

By letter dated July 23, 1986, McDevitt submitted Proposal No. 10, seeking an additional $64,811.68 for additional work required to undercut and haul away unsuitable soil, install French drains, and place filter fabric and a stone sub-base in certain areas of the north end of the site. McDevitt contends this additional work was performed pursuant to a contract modification agreed to by Marriott.

On March 17, 1986, Marriott relaxed the 95% compaction requirements for the parking lot and entrance areas at the north end of the site. (Body, Tr. at 755, 761). Thereafter, suitable fill material, after being inspected by Matrix, was placed in these areas to achieve the required compaction rate. (Sheats, Tr. at 220–21; PX–162, Matrix Report for 4/1/86). Sometime in late May or early June, McDevitt learned that the soil layer below the top 2 feet in the future parking area at the north end of the Project site had become very wet, soft and, therefore, unstable. (Sheats, Tr. at 221, 223). That discovery came after McDevitt's heavy equipment had become mired in the soil while driving through the area. (Sheats, Tr. at 221; Peters, Tr. at 278). After digging several test pits, it was determined that the soil was unsuitable for compaction. (Sheats, Tr. at 221–22). There was, at the time, some speculation that a ground water source, such as an underground spring, was the cause of the wet soil. (Goebel, Tr. at 541). This was never substantiated.

On or about May 30, 1986, Rick Peters, McDevitt's Project Manager, and Jack Body, Marriott's Project Manager, discussed the problem by telephone. Peters estimated that it would cost approximately $70,000 to $80,000 to remove the wet soil and replace it with stone fill. (Peters, Tr. at 279–80; Body, Tr. at 670–71, 754). Body refused to authorize payment by Marriott for this work. (Peters, Tr. at 279; Body, Tr. at 671). On McDevitt's behalf, Peters insisted that the work would not be done unless Marriott signed a work authorization order in advance. (Peters, Tr. at 280; Body, Tr. at 671, 754). No agreement was reached at that time with respect to payment for, or performance of, the work. McDevitt nonetheless commenced the work. On Saturday, May 31, 1986, McDevitt's subcontractor began removing the wet soil and replacing it with stone fill. (PX–52, Van Metre invoice). During the week of June 1, Body discussed the problem in general terms with Goebel and Leake, but did not mention that Peters had told him McDevitt would do no work unless Marriott paid for it. (Goebel, Tr. at 545, 567; Body, Tr. at 674, 753–54). Jim Goebel, Marriott's general superintendent, asked Jim Leake, Marriott's on-site soils representative, to inspect the relevant soft areas discovered by McDevitt. On June 3, Leake reported that there was no evidence of an underground spring. (PX–164, Matrix Report for 6/3/86). On June 5, John Baldwin, Marriott's Project superintendent, signed a Field Order directing McDevitt to do the extra work of replacing the wet soil with stone fill. (PX–54).

On or about June 9, Goebel signed a work order authorizing the replacement of the wet soil with stone fill, but halting the "haul-off" of additional soil until a pricing arrangement was agreed upon. (PX–53; Goebel, Tr. at 539). On June 10, he and Peters agreed by telephone that McDevitt would pay one-third the "haul-off" costs and Marriott the remaining two-thirds. (PX–53; Goebel, Tr. at 542, 565–66). Peters then made a notation on the work order reflecting that agreement. (PX–53). As Marriott's general superintendent of the Project, Goebel had the authority to approve additional work for which the contractor would receive additional compensation. (Goebel, Tr. at 538–39). And although he did not have the actual authority to approve expenditures in excess of $25,000, (Goebel, Tr. at 538–39; Body, Tr. at 756), he clearly acted, from McDevitt's reasonable perspective, with the apparent authority to offer such approval. Goebel testified that Marriott's informal practice was to consult the Project manager before authorizing any work costing close to $25,000.

(Goebel, Tr. at 539). In this case, Goebel, was apparently unaware of the approximate cost of the extra work he authorized and had simply assumed that it would be no more than $10,000 to $15,000. (Goebel, Tr. at 541–42). Even after learning of the actual cost of the work, however, Marriott never informed McDevitt that it would refuse to honor Goebel and Peters' payment compromise. (Body, Tr. at 757; Goebel, Tr. at 600). Moreover, although Goebel claimed that he only authorized the additional work because he believed that the cause was an underground spring (Goebel, Tr. at 544), the record demonstrates that Leake reported to Marriott on June 3, six days before Goebel's June 9 authorization, that he had discovered no underground springs in the problem area. (PX–164, Matrix Report of 6/3/86).

McDevitt now seeks to recover Marriott's alleged two-thirds share of the hauling costs ($26,132.33), pursuant to the agreement between Goebel and Peters, as well as the additional costs incurred to install stone fill, at Goebel's direction, in the relevant areas. (PX–52; Peters, Tr. at 284; Goebel, Tr. at 565). Marriott denies this liability and also challenges the reasonableness of the price paid by McDevitt for the extra work. Specifically, Marriott notes that the price paid was based on a truckload of 9 dry cubic yards per truck. (Sheats, Tr. at 225–26). In fact, McDevitt and Marriott agreed to reduce the load to 7 cubic yards per truck because the wet soil weighed more than dry soil. (Sheats, Tr. at 225–26). Photographs taken of the "loaded" trucks clearly establish that each truck carried less than a full load. (DX–196(a), (b), (c)). They do not, however, reveal how much less, if any, than 7 cubic yards was carried in each truck.

b. CONCLUSIONS OF LAW

■ McDevitt is entitled to receive compensation equal to two-thirds the costs of hauling the wet soil off-site. Under the Contract, the contractor bears sole responsibility for unanticipated soils problems (PX–2, Specs., Section 02010, Art. 1.03(A)), and is required to complete the work in strict compliance with the Specifications.

(PX–2, Gen'l Conditions, Art. 40(A)). The work performed by McDevitt—undercutting and hauling away unacceptable soil, installing French drains, and furnishing and installing filter fabric and a stone subbase—was necessary to meet the Specifications' requirements for the modified compaction rates in the underlying soils. McDevitt initially failed to meet those compaction requirements. As a direct result of that failure, the additional work became necessary.

Marriott, however—through its agent Goebel—authorized in writing the performance of that additional work and agreed to pay two-thirds of the hauling costs. From McDevitt's position, Goebel had the apparent authority to authorize such an expenditure. *See Dere v. Montgomery Ward & Co.*, 224 Va. 277, 295 S.E.2d 794, 796 (1982) ("Whether an act is within the apparent scope of an agent's authority turns upon the question whether 'an ordinarily prudent person ... would be justified in believing that he is authorized to perform the act.'") [quoting *Wright v. Shortridge*, 194 Va. 346, 353, 73 S.E.2d 360, 365 (1952)]; *accord Neff Trailer Sales, Inc. v. Dellinger*, 221 Va. 367, 269 S.E.2d 386, 388 (1980). And at no point after learning of Goebel's actions did Marriott ever inform McDevitt that it was repudiating this cost-sharing agreement. In effect, therefore, Marriott ratified Goebel's actions and is bound by the agreement. *See Norfolk Sand & Gravel Corp. v. Ohio Locomotive Crane Co.*, 217 F. 25 (4th Cir.1914), *cert. denied*, 238 U.S. 615, 35 S.Ct. 284, 59 L.Ed. 1490. (1915); *Kern v. J.L. Barksdale Furniture Corp.*, 224 Va. 682, 299 S.E.2d 365, 367 (1983).

■ Marriott's contention that the agreement was premised on a mistaken assumption, namely, that the cause of the wet soil was an underground spring, does not abrogate its written agreement. The doctrine of mutual mistake allows an obligor to void a contract only where there is " 'a mutual mistake as to the existence of facts which go to the essence of a contract....' " *Hitt*

*v. Cox*, 737 F.2d 421, 424 (4th Cir.1984) [quoting *United States v. Garland*, 122 F.2d 118, 121 (4th Cir.), *cert. denied*, 314 U.S. 685, 62 S.Ct. 189, 86 L.Ed. 548 (1941)]. Here, both parties knew that an underground spring was a possible cause of the wet subsurface conditions. Both parties, however, were also aware by early June that Leake, Marriott's on-site soils representative, had inspected the site and reported no evidence of an underground spring. Marriott has not, therefore, demonstrated that this mistaken belief actually motivated its agreement to pay. Even assuming, *arguendo*, that a mistaken belief was Marriott's motivation, it is far from clear that this mistake was central to the agreement. After Marriott learned that its belief was erroneous, neither Goebel nor any other Marriott official cancelled or repudiated the agreement. Had this assumption been central to the agreement, as Marriott now contends, it would have certainly acted to withdraw its previous consent or, at least, to renegotiate the cost-sharing arrangement. Marriott, by its inaction, confirmed that the underground spring assumption was not its sole reason for agreeing to pay. Moreover, it is well-settled that "[a] party bears the risk of a mistake when ... he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient...." Restatement (Second) of Contracts, § 154 (1981). *See also In the Matter of Westinghouse Elec. Corp. Uranium Contracts Litigation*, 517 F.Supp. 440, 458 (E.D.Va.1981). Here, Marriott chose to make the agreement with a limited amount of information. It, therefore, assumed the risk of what it now claims was a "mistake."

In short, both parties knew that an underground spring was only one possible cause of the wet soil. The agreement to divide the costs between the parties reflected their apparent uncertainty regarding the existence of an underground spring. In such circumstances, " 'where parties enter a contract in a state of conscious ignorance of the facts, they are deemed to risk the burden of having the facts turn out to be adverse, within very broad limits.' " *Id.* Here, the parties entered into a cost-sharing agreement which reflected their uncertainty regarding the cause of the problem. Marriott, therefore, assumed the risk that the cause was not an underground spring and is accordingly bound by its agreement to share the costs. McDevitt is entitled to $64,811.68 in compensation for the cost of the additional work ordered by Marriott, including Marriott's agreed share of the haul-off costs. In so holding, the Court rejects Marriott's challenge to the reasonableness of the costs incurred. That the trucks hauling the wet soil were not filled to capacity is conceded. There is, however, insufficient evidence from which the Court can conclude that the trucks were carrying less than the agreed-upon reduced load of 7 cubic yards. Instead, the Court is persuaded that McDevitt has carried its burden of showing that the claimed costs associated with hauling the soil were reasonable.

### 3. Proposal No. 21—Elevators
#### a. FINDINGS OF FACT

■ McDevitt's Proposal No. 21, dated October 8, 1986, requests an additional $6,364 as compensation for the costs of providing and installing wider, non-standard door jambs at six elevator doors.

The Contract Specifications require the contractor to install a "pre-engineered" elevator. (PX–2, Specs., Section 14240, Part 1.02). The Specifications also list three pre-engineered elevator manufacturers, the name and telephone number of a contact person, and the names or identifying numbers of acceptable models. (PX–2, Specs., Section 14240, Part 2.02). The "Fastrack III" model manufactured by Westinghouse Elevator Company is one of the models listed. On April 25, 1986, Westinghouse informed McDevitt by letter that its Fastrack III jamb design could not accommodate the wall thicknesses called for by Mar-

riott's architect in revised elevator shop drawings. (PX–56, at 4; Peters, Tr. at 296, 298–99, 423). Westinghouse ultimately agreed, at McDevitt's urging, to modify its standard, pre-engineered elevators to fit the architect's drawings for an additional $6,364. (PX–56, at 3; Peters, Tr. at 299).

On or about August 29, 1986, McDevitt issued a change order to Westinghouse, authorizing the necessary modifications. The modified elevators were installed in the Project. (Peters, Tr. at 300). Until its submission of Proposal No. 21, however, McDevitt concedes that it did not formally notify Marriott of this problem or of the additional costs to modify the elevators. (Peters, Tr. at 426–28).

### b. CONCLUSIONS OF LAW

It is conceded that McDevitt failed to give Marriott the seven days' written notice of the additional costs required to accommodate the Marriott architect's drawings for the elevators. The Contract explicitly requires such notice. Article 17(A) of the General Conditions requires McDevitt to obtain written authorization from Marriott before performing any change in its work. (PX–2). Moreover, Article 18 specifically requires seven days' written notice and, except in emergency cases, written authorization before proceeding on work based on an instruction in the shop drawings for which McDevitt claimed entitlement for additional compensation:

> If the Contractor claims that any instructions by Drawings (including Shop Drawings) or written clarification or otherwise involve extra costs under his Contract, he shall give the Owner's Representative written notice within seven (7) days, complete with detailed labor and material costs. Except in an emergency which endangers life or property, the Contractor shall not proceed without written acceptance in the form of a Change of Contract or written notice to proceed from the Owner. The failure of the Contractor to provide such written notice shall deprive the Contractor of its right to claim such extra costs.

(PX–2, Gen'l Conditions, Art. 18). *See also* PX–2, Gen'l Conditions, Art. 17(A) ("Contractor shall not perform any change in the Work without prior written authorization."). (PX–2). By the terms of the Contract, therefore, McDevitt's failure to give such notice bars this subsequent claim for additional compensation. *See United States v. Centex Construction Co., Inc.,* 638 F.Supp. 411, 413–14 (W.D.Va.1985); *Service Steel Erectors Co. v. SCE, Inc.,* 573 F.Supp. 177, 178–81 (W.D.Va.1983); *John W. Johnson, Inc. v. J.A. Jones Construction Co.,* 369 F.Supp. 484, 494 (E.D. Va.1973); *Atlantic and Danville Ry. v. Delaware Construction Co.,* 98 Va. 503, 37 S.E. 13 (1900).

McDevitt's argument that formal written notice was unnecessary because it was Marriott's architect who first brought the discrepancy to McDevitt's attention is not well-founded. It may be construed, in essence, as a claim that Marriott implicitly waived the notice requirement. It may be true that the suggested modifications to the elevator door jamb to accommodate the Specifications were made by the architect before the shop drawings were even returned to McDevitt. There is no evidence, however, that the architect or anyone at Marriott was aware of the attendant costs. McDevitt has failed to demonstrate by a preponderance of the evidence, let alone by clear and unmistakable evidence, that Marriott, by the actions of its architect, implicitly waived the notice requirement. *See Service Steel Erectors Co.,* 573 F.Supp. at 179 (burden on party claiming waiver to establish waiver by clear and unmistakable evidence) [citing *May v. Martin,* 205 Va. 397, 137 S.E.2d 860, 865 (1964)]. McDevitt's mere assumption that the shop drawing revisions represented Marriott's final decision on the elevator door size is insufficient to excuse McDevitt's explicit contractual obligation to notify Marriott of the additional costs incurred as a result of the revisions. By failing to notify Marriott, McDevitt effectively precluded Marriott from re-examining its drawings and perhaps selecting less costly alternatives.

McDevitt is, therefore, responsible for the additional $6,364.

### 4. Proposal No. 26—Temporary Heat
#### a. FINDINGS OF FACT

By letter dated July 8, 1987, McDevitt submitted Proposal No. 26, seeking additional payment of $46,571 for the cost of temporary heat in the buildings from November 1986 through March 1987. (PX–58). Before trial, McDevitt reduced its request to $23,453 for the period from December 3, 1986 to January 29, 1987, and in building D only, for the period from February 4, 1987 to March 10, 1987. (PX–58; Peters, Tr. at 300–09, 457). McDevitt also sought a 26–day time extension for delays due to "changes in the design of the switchgear, lack of an executed change order to perform the work, [and] Virginia Power enerization [sic] date slippages." (PX–58; see also Peters, Tr. at 430).

#### (i) Permanent Electrical Service

The Contract requires the contractor to provide any temporary heat necessary to maintain the prescribed construction schedule. (PX–2, Supplemental Conditions, Art. 1.02). Once permanent electrical service had been connected, however, approximately "sixty (60) days prior to building turnover," Marriott was obligated to pay for the utilities. (PX–2, Supp. Conditions, Art. 1.04).

On June 2, 1986, Virginia Power informed Marriott, by letter, that installation of permanent electrical service was scheduled to begin July 29, 1986, provided seven prerequisites were satisfied by July 1, 1986. (PX–63). These requirements included the return of a signed and notarized "right of way agreement" and the installation of the electrical switchgear. (PX–63). One month later, by letter dated July 2, 1986, Virginia Power rescheduled the connection of electrical service to August 19, 1986 because the seven requirements had not yet been met. (PX–64). At some later point, Virginia Power again rescheduled connection for November, 1986. For a third time, connection work was rescheduled to begin on December 1, 1986 because, in part, McDevitt had not yet installed the

electrical switchgear. This work was scheduled to be completed on December 22, 1986. (DX 105; Peters, Tr. at 434). As matters turned out, McDevitt did not install the switchgear until December 3, 1986. (PX–61; Peters, Tr. at 305, 433–34). Accordingly, Virginia Power had to reschedule yet again the date on which connection service was to begin. Apparently, a contractor who misses the scheduled date for Virginia Power work is placed at the bottom of Virginia Power's waiting list. (Goebel, Tr. at 562–63, 594). Rescheduling may then take several additional weeks. (Goebel, Tr. at 562–63, 594). By the second week of December, 1986, McDevitt had completed all the contractual work that was a necessary predicate to connection of permanent power. (Peters, Tr. at 431–32, 434). Thereafter, by letter dated January 9, 1987, McDevitt tentatively confirmed with Virginia Power that permanent power would be connected on or about January 21, 1987. (DX–106).

In the meantime, Marriott had not yet received approval for the required easement. On November 25, 1986, Marriott sent to Virginia Power a "Grant of Easement." (DX–108; PX–66). Rick Peters, McDevitt's Project Manager, testified that a Virginia Power representative who visited the Project site in December, 1986, told him that Marriott did not yet have the required easement in place. (Peters, Tr. at 306, 434–36). On January 14, 1987, Virginia Power rejected the easement, citing six stumbling blocks to approval. (PX–67). At no point, however, did Virginia Power suggest or warn that full energization would be delayed until these problems were ironed out. (PX–67). By January 16, 1987, however, the easement was apparently approved. On that day, Marriott's counsel sent Marriott's Project superintendent a copy of the "fully-executed [Virginia Power] easement agreement." (PX–68). And on January 29, 1987, Virginia Power connected the permanent power for the Project. (PX–62; Peters, Tr. at 302–03, 306). Until that time, McDevitt supplied temporary heat to the building areas.

**(ii) Building D Rooftop Heating Units**

Even after permanent power was connected, McDevitt claims that from February 24 to March 10, 1987, the permanent heating units on the roof of Building D were allegedly unusable because of an alleged error in the contract design. That design, according to McDevitt, placed the units too close to the rear of the roof to satisfy the local building code. Until a waiver was obtained, McDevitt alleges that the permanent heating units could not be used, and temporary heat was provided by McDevitt. (Peters, Tr. at 307–09). McDevitt, however, presented no evidence that the Town of Herndon prohibited or prevented McDevitt from using the heating units before the waiver was granted. (Peters, Tr. at 307–08). Moreover, before trial, McDevitt never communicated to Marriott that the rooftop unit design had created problems. (Peters, Tr. at 431).

### b. CONCLUSIONS OF LAW

**(i) Permanent Electrical Service**

■ From December 3, 1986 to January 29, 1987, McDevitt alleges that the only obstacles to Virginia Power's provision of permanent electrical service was either the lack of an acceptable easement or Virginia Power's scheduling requirements, that is, causes allegedly beyond McDevitt's control. McDevitt, therefore, seeks reimbursement for the cost of providing temporary heat during that time period. The Court is not persuaded. As a preliminary matter, the actual delay period, if any, did not begin on December 3, 1986, as McDevitt claims, but on or after January 21, 1987. According to the oft-revised work schedule, even if McDevitt had completed its work by December 1, 1986 so that Virginia Power could have commenced its connection activities and Marriott had obtained the easement, full energization would not have occurred until December 22, 1986. Still,

McDevitt did not meet that deadline and the next scheduled energization date was January 21, 1987. The more accurate delay period, if any, would therefore have been only eight days, from January 21 to January 29, 1987.

In any event, the Court rejects McDevitt's contention that Marriott should be held liable for this delay. To begin with, this claim is unenforceable under the Contract. McDevitt essentially seeks to recover damages due to an alleged delay by Marriott. Article 7(A) of the Contract's General Conditions [4] explicitly bars such claims. (PX-2). Such "no damage for delay" clauses are generally enforceable. *See W.C. James, Inc. v. Phillips Petroleum Co.*, 485 F.2d 22, 25 (10th Cir.1973); *F.D. Rick Co., Inc. v. Wilmington Housing Authority*, 392 F.2d 841, 843 (3d Cir.1968); *George J. Grant Construction Co. v. United States*, 109 F.Supp. 245, 246, 124 Ct.Cl. 202 (1953). And there is no evidence that any such delay by Marriott was unreasonable, intentional, or fraudulent such that the clause should not be enforced. *See E.C. Ernst, Inc. v. Manhattan Construction Co.*, 551 F.2d 1026, 1029, *reh'g granted, in part, on other grounds*, 559 F.2d 268 (5th Cir.1977), *cert. denied sub nom, Providence Hospital v. Manhattan Construction Co.*, 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978). Beyond this, and even assuming Article 7(A) is unenforceable, McDevitt has failed to offer persuasive evidence that Marriott's delay in obtaining approval of the easement delayed the connection of permanent power. The record establishes only delays caused directly by McDevitt's delays which, in turn, necessitated the numerous rescheduling efforts by Virginia Power. McDevitt is, therefore, precluded by the Contract from recovering damages the delays, even if proven, and must shoulder the additional costs of temporary heating until January 29, 1987.

---

4. Article 7(A) provides, in pertinent part, that Owner, its agents and employees shall not be held responsible for any loss or damage sustained by Contractor, or additional costs incurred by Contractor, through delay caused by Owner or its agents and employees, or any other Contractor or Subcontractor, or by ab-

normal weather conditions, or by any other clause, and Contractor agrees not to make, and hereby waives, any claim for damages, and agrees that the sole right and remedy therefor shall be an extension of time. (PX–2, Gen'l Conditions, Art. 7(A)).

### (ii) Building D Rooftop Heating Units

■ The Contract also specifically precludes claims for additional costs due to plan designs unless the contractor promptly provided Marriott adequate notice of the problems and possible additional costs. (PX–2, Gen'l Conditions, Arts. 17(A), 18). McDevitt admittedly failed to provide Marriott such advanced notice. And there is no allegation by McDevitt that Marriott waived the notice requirement. McDevitt's claim, therefore, is explicitly barred. *See United States v. Centex Construction Co., Inc.*, 638 F.Supp. 411, 413–14 (W.D.Va. 1985) (contractor's failure to comply with seven-day damage notification clause barred subsequent claim for additional payment); *Service Steel Erectors Co. v. SCE, Inc.*, 573 F.Supp. 177, 178–81 (W.D.Va. 1983) (absent waiver by general contractor, subcontractor's failure to provide timely notice of extra work barred claim for additional compensation); *John W. Johnson, Inc. v. J.A. Jones Construction Co.*, 369 F.Supp. 484, 494 (E.D.Va.1973) (subcontractor's failure to obtain prior written approval for extra or changed work precludes claim for additional compensation).

### 5. Proposals No. 54, 55, 81—Sprinkler System

#### a. FINDINGS OF FACT

On March 9, 1987, McDevitt submitted to Marriott Proposal Nos. 54 and 55. In Proposal No. 54, McDevitt seeks $17,580 for certain revisions to the attic dry sprinkler system necessary to comply with local code requirements and to be compatible with the roof framing system. (PX–73; Peters, Tr. at 309). Proposal No. 55 claims $4,210 for revisions to the sprinkler system necessary to meet the specific requirements of the Fairfax County Fire Marshal. (PX–74). On June 3, 1987, McDevitt submitted Proposal No. 81, claiming an additional $3,141 for the addition of flow and tamper switches to the sprinkler system in order to coordinate the fire alarm system and the sprinkler system. (PX–81). In total, McDevitt claims $24,731 for additional work necessary to conform the Project's

sprinkler system to the applicable local codes. (Peters, Tr. at 313–15).

Marriott's Contract drawings call for a fire sprinkler system and specified the number, type and location of heads, and the routing and size of pipe to be used. (PX–3; Peters, Tr. at 310; Body, Tr. at 786–87). Fairfax County required changes in the system depicted by Marriott's drawings to ensure code compliance. (PXs–73, 74, 90; Peters, Tr. at 310). McDevitt's subcontractor made the necessary changes. The Project's fire alarm system currently meets the County requirements. Marriott issued change orders to pay $25,031 for some of the changes made by McDevitt's subcontractor. (Peters, Tr. at 310–11; PXs–6, 9). Marriott agreed to pay for those particular changes because it believed that McDevitt could not reasonably have anticipated the relevant code revisions when it submitted its bid. (Body, Tr. at 720–21). Other necessary changes were attributable to the failure of McDevitt's subcontractor to recognize that changes in the drawings were necessary for code compliance. McDevitt now seeks payment for these additional work changes performed.

In a letter to Marriott dated February 6, 1987, McDevitt acknowledged that "the flow and tamper switches are a part of [McDevitt's subcontractor's] scope of work and that their shop drawings should have shown all of the flow and tamper switches necessary to provide a complete and workable system." (DX–115, at 2). That letter, however, further noted that the subcontractors responsible for adding the flow and tamper switches and preparing the revised fire alarm submittal package "will submit a proposal to McDevitt & Street Co. analyzing any costs incurred above and beyond the bid documents. McDevitt & Street will in turn submit a proposal to Marriott for the same.... No work will be performed nor will equipment be ordered until Marriott has issued a change order for the additional work." (DX–115, at 2).

#### b. CONCLUSIONS OF LAW

■ Under the Contract, McDevitt is clearly responsible for ensuring compliance

with relevant local codes, including the fire code. (PX–2, Specs., Section 15300, Part 1.06(D); Gen'l Conditions, Art. 8(C)). That responsibility included the installation of flow and tamper switches necessary to coordinate the fire alarm system, (PX–2, Specs., Section 15300, Part 1.06(D)), and "[a]larm system devices, including alarm valves, flow switches, tamper switches all coordinated with Fire Alarm and Detection Section." (PX–2, Specs., Section 15300, Part 1.02(B)). If such compliance required changes in the shop drawings or specifications, the Contract explicitly provides that such changes would be "covered by Change of Contract" after notification to Marriott by the contractor, as described in Article 8(C) of the General Conditions:

> Contractor warrants that, when completed, the Work shall be in compliance with all such laws, ordinances, codes, rules and regulations, and the requirements of the Board of Fire Underwriters, in effect at the time of completion. *If the Contractor observes that the Drawings and Specifications are at variance therewith, he shall promptly notify the Owner's Representative, in writing, and any necessary changes shall be covered by Change of Contract in accordance with Article 17 hereof.* If the Contractor performs any work that is contrary to such laws, ordinances, codes, rules and regulations, the Contractor shall bear all costs including demolition costs, reconstruction costs, and all fines.

(PX–2, Gen'l Conditions, Art. 8(C)) (emphasis added). The responsibilities of McDevitt as contractor were thus very clear: it was responsible for detecting and correcting any inconsistencies between the drawings and the code requirements. The Contract expressly provides that the:

> [s]prinkler and standpipes layouts and routing shown on the Fire Protection drawings and sprinkler head locations shown on the Architectural drawings are *for information only.* The contractor shall be responsible for the actual layouts, routing of piping and additional sprinkler heads and piping necessary, to meet all code and insurance requirements. The contractor shall be respon-

sible for obtaining all permits and approvals for the systems from code and insurance officials but shall not propose any alteration, or addition to, the layout, pipe routing or sprinkler head locations without prior approval of the architect/engineer.

(PX–2, Specs., Section 15300, Part 1.06(D)) (emphasis added). If changes were necessary for code compliance, McDevitt was required to notify Marriott of the necessary changes. Marriott, in turn, was obligated to issue a Change of Contract to the extent the changes were, in fact, necessary. There is no requirement, however, that Marriott approve in every Change of Contract a concomitant increase in the Contract price. Under Article 17, a Change of Contract may authorize "a change in the Work *or* an adjustment of the Contract Sum *or* the time of performance." (PX–2, Gen'l Conditions, Art. 17(B)) (emphasis added).

Here, McDevitt clearly satisfied its contractual obligation to install the fire sprinkler system in accordance with local code requirements and to provide Marriott notice of the necessary changes and attendant costs. Marriott, however, was under no contractual obligation to authorize an increase in the Contract Sum. Its refusal to do so was, therefore, within its contractual prerogative. There is no reason for this Court to interfere with that decision, absent a showing of fraud or misrepresentation by Marriott. And McDevitt has made no such allegation. McDevitt, therefore, must bear the full burden of the additional costs involved.

### 6. Proposal No. 95—Fork Lift Truck Rental

#### a. FINDINGS OF FACT

McDevitt's Proposal No. 95 seeks an additional $3,302 for the cost of renting a fork lift truck for Marriott's use in moving furniture, fixtures and equipment (FF & E) into the upper floors of the hotel. (Peters, Tr. at 318–19).

Under the Contract, the Contractor is obligated to "provide access to the Project for the delivery, setting in place and instal-

lation of furniture, fixtures and equipment, and to provide Owner with two elevators (if elevators are present on the Project) for Owner's exclusive use in such setting in place and installation." (PX–2, Gen'l Conditions, Art. 31(B)). Elevators are unquestionably present on this Project. The only contractual restriction on their use was a prohibition against using them "temporarily for building construction purposes except as directed after acceptance of the complete installation or after signing of Contractor's 'Temporary Acceptance' form." (PX–2, Specs., Section 14240, Part 1.11).

On or about February 12, 1987, Marriott and McDevitt agreed that FF & E installation would begin on February 23, 1987. McDevitt agreed to have two elevators ready for Marriott's use by that date. (DX–170; Peters, Tr. at 413–14). McDevitt failed to do so; the elevators were not ready on time. (DX–170; Peters, Tr. at 413–14). To accommodate Marriott, McDevitt rented a fork lift truck for $3,302 to enable FF & E installation to proceed as scheduled.

### b. CONCLUSIONS OF LAW

The additional expense incurred by McDevitt in renting a fork lift truck was simply the result of its failure to meet its contractual obligation to have elevators ready for Marriott's use. The Contract requires McDevitt to provide Marriott with two elevators for use during FF & E installation, and McDevitt clearly failed to do so. It is equally clear that FF & E installation did not fall within the Contract's limitation on the elevators' use for building construction. Under the plain language of the Contract, therefore, McDevitt must bear the financial consequences for its failure. Accordingly, McDevitt may not recover from Marriott the $3,302 for the forklift truck rental.

### B. *Excusable Delay Issues*

#### 1. Effect of Adverse Weather on Soils

McDevitt claims a 56–day excusable delay due to the effects of the allegedly ab-

normal adverse weather on the soils. Based on the factual findings and legal conclusions stated *supra* in Section I(A)(1), the Court concludes that this delay is not excusable under the Contract.

#### 2. Slab–On–Grade in Building D

##### a. FINDINGS OF FACT

McDevitt also alleges its entitlement to a 19–day delay for the period August 14 to September 2, 1986, during which Marriott was deciding whether a slab-on-grade or structural slab should be installed in Building D.

The Contract calls for a slab-on-grade in Building D. (PX–3; Peters, Tr. at 323). Structural slabs, however, had been used in the north ends of Buildings A and C to compensate for the failure to achieve 95% compaction in the structural fill on which the slabs rested.[5] (Peters, Tr. at 326). Tests performed on May 7, 1986, revealed at least 95% compaction in the slab area of Building D. (DX–174; PX–30; Body, Tr. at 680–81; Peters, Tr. at 327). Both Marriott and McDevitt representatives were present when the May 7 tests were made. The nature of the tests yielded immediate results. (Peters, Tr. at 409–10). Mariott also received these test results as part of a more comprehensive report by Soils Consultants, Inc. Report which accompanied McDevitt's Proposal No. 9, submitted on July 31, 1986. (Body, Tr. at 675–77, 681, 771; Peters, Tr. at 409). From June to early September, 1986, there apparently remained some uncertainty regarding whether the soil in the Building D slab area was sufficiently compacted to support a slab-on-grade. (Peters, Tr. at 324). Throughout that period, Marriott and McDevitt discussed whether a structural slab should be used in lieu of a slab-on-grade in Building D. (Peters, Tr. at 325; Goebel, Tr. at 569, 576). On June 9, for example, Marriott met with a structural engineering to discuss the use of a structural slab in Building

---

5. As used here, a "structural slab" is a concrete floor slab that is self-supporting. In contrast with a "slab-on-grade," there is no need for 95% compacted soil underneath a structural slab. A structural slab, therefore, is only needed where 95% compaction is not achieved.

D. (PX–143, Report No. 2; Goebel, Tr. at 570, 574–76). And on July 14, the structural engineer hired by Marriott submitted a partial plan for a structural slab in Building D. (PX–291; Peters, Tr. at 325–26).

On August 8, 1986, McDevitt submitted to Marriott a written Request for Information (RFI), requesting a final decision regarding the use of a slab-on-grade in Building D. (DX–58, at 2). The RFI asserted that McDevitt had been "awaiting this information for months" and requested a reply by August 15. (DX–58, at 2). There is, however, no written documentation of the alleged previous requests by McDevitt to Marriott for information relating to this issue. (DX–58; Peters, Tr. at 413). On August 20, Marriott responded that a structural engineering firm would provide Marriott information on this problem by August 22, 1986. (DX–58, at 2). This was also communicated to McDevitt in a meeting on August 20. (DX–59, at 1). A letter from McDevitt to Marriott dated August 22, 1986 noted that "Marriott is to consult Meyer Associates [Marriott's structural engineers] and instruct McDevitt & Street as to a procedure to follow for the slab on grade by the beginning of the week of August 25, 1986." (DX–59, at 2). Also in that letter, McDevitt & Street stressed that "not receiving an answer from Marriott this week would have a direct impact on the schedule." (DX–59, at 1).

Sometime after the August 20 meeting, Marriott, by telephone, tentatively approved the use of a slab-on-grade on condition that Soils Consultants, Inc. confirm in writing the suitability of the soils. (Peters, Tr. at 330; Body, Tr. at 682–84, 688–89). Soils Consultants, Inc. provided such a letter on September 3 (DX–56, at 2), and Marriott then authorized the use of the slab-on-grade. (DX–57; Body, Tr. at 687–88, 691). The slab-on-grade work had already commenced one day earlier. (DX–194; Hutchison, Tr. at 474, 488–89, 496). McDevitt had been in a position to begin the slab-on-grade work on August 14, 1986. (Hutchison, Tr. at 496). And the delay from August 14 to September 2 constituted a delay in the Project's critical path. (Hutchison, Tr. at 468, 474, 488). At no point before or after August 14, however, did Marriott explicitly instruct McDevitt to stop, suspend, or delay construction of the slab-on-grade for Building D. Nor did Marriott ever expressly instruct McDevitt to substitute a structural slab for a slab-on-grade in Building D. (Boyd, Tr. at 674–75; Goebel, Tr. at 545–46; DX–58; Peters, Tr. at 409, 412–13).

b. CONCLUSIONS OF LAW

 McDevitt argues that the critical path delay from August 14 to September 2 was Marriott's fault. The evidence shows to the contrary. Despite McDevitt's claims otherwise, the record clearly reveals that McDevitt did not formally bring to Marriott's attention the potential need for a structural slab in lieu of a slab-on-grade in Building D until its submission of the August 8, 1986 RFI. Thereafter, Marriott responded with reasonable promptness. It immediately asked an engineering firm to design such a structural slab before making a final decision. Shortly thereafter, relying on assurances from a soils consulting firm that 95% compaction had been achieved in the slab area, Marriott approved the use of a slab-on-grade. (DX–58, at 2).

Significantly, the slab-on-grade/structural slab debate was first prompted by concern that McDevitt had failed to achieve 95% compaction in the requisite area. The fact that 95% compaction had been achieved during one round of tests in May apparently did not alleviate the parties' concern; maintenance of the compaction rate was still in doubt in August, nearly three months later. Had McDevitt clearly met this contractual requirement, there would have been no need for a structural slab, and the slab-on-grade called for in the Contract could have been installed without further delay. In sum, McDevitt has failed to demonstrate that this delay was excusable.

3. Underslab Kitchen Utilities in Building D

a. FINDINGS OF FACT

Marriott also seeks a 19–day time extension for delays resulting from Marriott's

post-installation alterations in the underslab utilities located in the kitchen area of Building D.

Prior to October 2, 1986, McDevitt installed the utilities in conformance with the Contract drawings. On October 2, Marriott inspected the underslab utilities in the kitchen area of Building D for conformance with the Contract plans and Specifications. (PX–286; Goebel, Tr. at 549; Peters, Tr. at 340–41). Marriott's inspector discovered "discrepancies between drawings." Specifically, she observed that the utilities were installed according to the 1984 generation drawings, rather than in accordance with the new 1987 generation drawings. At that time, Marriott had not provided the 1987 generation drawings to McDevitt or its subcontractors. (PX–286, at 4; Peters, Tr. at 451–52). On the day of the inspection, McDevitt was given a copy of the inspection report, with the handwritten notation "[a] copy of this report should be given to the electric & plumbing subcontractors so they can make the necessary corrections before slab is poured in "D" Bldg." (DX–72, at 1). This notation from Andy Muranko, a Marriott superintendent, constituted, in effect, a directive to McDevitt to make those corrections, with the implicit promise that McDevitt would, in return, receive additional compensation. (Goebel, Tr. at 577–78). On October 16, Marriott formally ordered McDevitt to do the required additional or changed work. (Peters, Tr. at 343; PX–153, Oct. 16, 1986 Daily Report, at 1). The corrections and additional work admittedly should have required only two to three days work. (Sheats, Tr. at 273; Goebel, Tr. at 551–553). McDevitt performed the additional or changed work from October 16 to October 21. (Peters, Tr. at 343; Hutchison, Tr. at 502). And Marriott paid for it. (Peters, Tr. at 345–46; Hutchison, Tr. at 552). In the meantime, soil compaction tests in the areas adjacent to Building D and above the underslab utilities indicated that the required compaction had not yet been achieved in the mechanical area as late as October 21, 1986. The lack of adequate compaction, therefore, also delayed the

pouring of the slab-on-grade. (DX–62; Peters, Tr. at 407–08).

McDevitt never complained to Marriott regarding the alleged delay from October 2 to October 21. No request for a time extension for this delay was submitted, nor did McDevitt include it in a letter detailing all claimed delays (DX–144) or in its answer to Marriott's interrogatories when asked to specify all delays for which McDevitt believed Marriott to be responsible. (DX–147, Interrogatory Nos. 20, 23; Peters, Tr. at 405–06). McDevitt, therefore, did not provide Marriott written notice of its claim for extension of time. The Contract requires such notice. (PX–2, Gen'l Conditions, Art. 7(B)).

### b. CONCLUSIONS OF LAW

■ The Contract expressly bars McDevitt's tardy request for a 19–day extension. McDevitt never provided Marriott the contractually-required written notice of its claim for an excusable delay. Moreover, McDevitt has failed to demonstrate that the kitchen utility changes, in fact, delayed the critical path beyond the delay caused by McDevitt's failure to achieve the required soil compaction in the utilities area. Based on the record before the Court, the Contract terms are binding and the delay is not excusable.

### 4. Above Ceiling Conflicts in Building D
### a. FINDINGS OF FACT

McDevitt claims either a 36–day or 44–day time extension for delay due to conflicts in the Contract drawings for the duct, conduit, and piping located above the ceiling in Building D. (Peters, Tr. at 366–67).

In Building D, the duct work was installed before the slab-on-grade was poured. (Peters, Tr. at 368). On November 3 and 10, 1986, the slab-on-grade was poured so that the remaining above-ceiling utility work could proceed. (Stipulation, Tr. at 354). During the installation of other above-ceiling mechanical, electrical, and plumbing lines, McDevitt discovered conflicts between the Contract drawings for the duct, conduit, and piping. (Peters, Tr. at 368). In early November, Marriott and McDevitt discussed possible solutions for

the conflicts. (Peters, Tr. at 372). On November 28, McDevitt submitted to Marriott RFI No. 62, seeking Marriott's guidance on further action with respect to the conflicts. (PX–176; Peters, Tr. at 372). Marriott and McDevitt representatives met on or before December 5 and again on December 9 to discuss the problem. (DX–99; DX–100; Peters, Tr. at 381–82). Marriott agreed, as a partial solution, to lower the ceiling height in some places in order to increase the available above-ceiling space for mechanical, electrical, and plumbing line installation. (DX–100; Goebel, Tr. at 554, 556–57). After the December 9 meeting, McDevitt offered to proceed with the modifications without sketches, provided Marriott would assume responsibility "if the scope of work varies when details and sketches are provided." (PX–180). Marriott refused to assume that responsibility. (PX–180; Peters, Tr. at 441–42). On December 16, sketches were issued reflecting the resolution worked out at the December 9 meeting. (Stipulation, Tr. at 355; DX–100). By December 16, 1986, the conflicts were resolved. (Peters, Tr. at 372–73).

A substantial factor in the conflicts was McDevitt's failure to coordinate the sequence of the above-ceiling utilities' installation. (Goebel, Tr. at 554–59, 578–83). According to Marriott's General Superintendent, the standard industry practice is to install the drain lines first, followed by the heating, ventilating and air conditioning ducts, and then the smaller water and sprinkler lines. (Goebel, Tr. at 559). Here, the utilities were not installed in any particular order. Significantly, other contractors in substantially similar Courtyard by Marriott projects, using the same Contract drawings, installed the mechanical, electrical and plumbing lines in Building D without lowering the ceilings. (Goebel, Tr. at 554–56, 579–83). In the one other Courtyard project where similar problems with the duct work were encountered, the contractor replaced the original mechanical subcontractor with another subcontractor and back-charged the original subcontractor for the remaining work. (Odie, Tr. at 979–80).

Until December 1, 1986, the delay from the above-ceiling conflicts coincided with the delay from remedial work on the slab-on-grade. (Hutchison, Tr. at 507). From December 1, when the slab-on-grade was completed, to December 16, the sole cause of delay to the Project's critical path was the resolution of the above-ceiling conflicts. (Hutchison, Tr. at 490, 503–07; Body, Tr. at 785). Although McDevitt continued working in other areas with the same number of employees during this period, the record does not reflect whether the alternative work was on the Project's critical path. DX–294; Rodgers, Tr. at 866; Goebel, Tr. at 561, 591). The Court concludes it was not.

At the time of these changes, Marriott issued change orders in which it agreed to pay a compromise amount for the cost of the extra work. (Peters, Tr. at 373–74). The parties also agreed to allow McDevitt to reserve its right to seek a time extension at a later point. (Peters, Tr. at 443–44; Body, Tr. at 783–84).

### b. CONCLUSIONS OF LAW

█ McDevitt is not entitled to any delay for the additional work necessary to install the above-ceiling utilities in Building D. There was clearly a delay in the Project as a result of this problem. The problem, however, was directly attributable to McDevitt's failure to coordinate the installation of the various above-ceiling utilities. Had McDevitt properly coordinated its work, the interferences would likely not have occurred. Because McDevitt failed to do this, utilities were installed below the designated ceiling height to accommodate interferences. The ceiling then had to be lowered. No action or inaction of Marriott unreasonably delayed the resolution of the problem. Once the problem was brought to Marriott's attention, it acted promptly to meet with McDevitt to resolve the problem. Such delay, therefore, is not excusable under the Contract.

### 5. Fire Alarm and Sprinkler Systems
#### a. FINDINGS OF FACT

The final time extension sought by McDevitt is 10 days for delay associated

with the approval of the fire alarm and sprinkler systems. McDevitt places blame for this portion of the delay on Marriott and Fairfax County.

The Contract documents describe the general requirements for the Project's fire alarm system. (PX–2, Specs., Section 16720; Peters, Tr. at 375). But the Contract also requires McDevitt to "[p]rovide a complete fire alarm system in accordance with all codes." (PX–2, Specs., Section 16720, Part 1.02). Before installation of the fire alarm, McDevitt had to obtain Marriott's approval of the fire alarm shop drawings, (PX–1, Schedule A, Art. 4(e)), and any changes in the shop drawings required by the Fire Marshal were to be reviewed and approved by Marriott before implementation. (Body, Tr. at 777). Under the Contract, McDevitt was required to submit the fire alarm shop drawings to Marriott within 60 days of the date of the Agreement, or by April 2, 1986. (Stipulation, Tr. at 356; DX–127). On April 15, 1986, 13 days late, McDevitt submitted to Marriott the requisite shop drawings. (DX–195; Stipulation, Tr. at 356). On May 9, Marriott's architect approved the shop drawings and returned them to McDevitt. (DX–195; DX–139; Stipulation, Tr. at 356–57). On July 29, 80 days later, McDevitt submitted the shop drawings to the Fairfax County Fire Marshal. On October 2, the Fire Marshal rejected the drawings. (Stipulation, Tr. at 357; DX–195; DX–198; Peters, Tr. at 396–97). After the rejection, Marriott made changes in the drawings. The changes were first made in Revision 4 and issued in November, then withdrawn and revised again, and re-issued on December 5, 1986. (PX–191; Tr. at 444–45; Body, Tr. at 777). On January 7, 1987, 33 days later, McDevitt submitted those revised drawings to the County Fire Marshal. On January 15, the Fire Marshal rejected this submission. (Stipulation, Tr. at 357–58; DX–129).

On February 5, McDevitt and Marriott held a meeting to discuss problems with the fire alarm shop drawings. (DX–115; Stipulation, Tr. at 358). As discussed at the meeting, the primary reason for the Fire Marshal's rejections of the drawings

was the failure to provide in the shop drawings a comprehensive description of the fire alarm system and its interrelationship with other systems, e.g., the sprinklers and elevators. (DX–115; DX–136; Body, Tr. at 702–04; Peters, Tr. at 389–91). The Contract places on the contractor the responsibility to provide this coordination. (PX–2, Specs., Section 15300, Part 1.02(B), and Section 16720, Part 2.02). At the meeting, Marriott also provided a sketch to McDevitt detailing an electrical panel for the alarm system. (DX–115; DX–126; Peters, Tr. at 389). This sketch was the last material McDevitt needed from Marriott to proceed further.

On February 20, revised drawings were submitted for a third time to the Fire Marshal. (DX–116; Stipulation, Tr. at 358). On March 19, 1987, the Fire Marshal again rejected the submission. (DX–118; Stipulation, Tr. at 358). Sometime after March 19, further revised drawings were submitted by McDevitt to the Fire Marshal. (Stipulation, Tr. at 358). The Fire Marshal never approved the fire alarm submittal. But on May 1, 1987, the Fire Marshal approved the installed fire alarm system. (Stipulation, Tr. at 358; Peters, Tr. at 399–400; Body, Tr. at 706–07).

McDevitt's failure to obtain final approval of the fire sprinkler system contributed to the delay in completion of this Project. Final approval of the installed system was withheld because the attic dry sprinkler lines repeatedly failed the "60–second trip test," that is, McDevitt could not demonstrate that water would reach all sprinkler heads within 60 seconds of the initiation of water flow. (Peters, Tr. at 398–99). In September 1986, the Fire Marshal suggested that the dry sprinkler system indicated on the shop drawings may be inadequate. McDevitt and its sprinkler subcontractor assured the Fire Marshal that the system would meet the code requirements, namely, pass the 60–second trip test. (DXs–78, 79, 80, 81). From January 1987 to April 24, 1987, however, the dry sprinkler system failed the test on at least seven occasions. (Stipulation, Tr. at 359–60; DX–86; Peters, Tr. at 399). The system finally passed on

April 29, 1987. (Stipulation, Tr. at 359–60). McDevitt concedes that Marriott is not responsible for the fire sprinkler system delay. The critical path delay attributable solely to fire alarm problems was, therefore, no more than two days, from April 29, 1987 to May 1, 1987 when the fire alarm system was approved.

### b. CONCLUSIONS OF LAW

■ The additional two-day delay due to the fire alarm system is not excusable under these circumstances. Whatever minor delays Marriott may have caused at various points in the approval process, McDevitt was solely responsible for delays far in excess of two days, or even of the full 10–day period claimed. For example, McDevitt was responsible for the unexcused 13–day delay in submitting the original shop drawings (from April 2 to April 15, 1986), another unexcused 80–day delay in submitting the Marriott-approved drawings to the Fire Marshal (May 9 to July 29, 1986), a 33–day delay in resubmitting the revised drawings to the Fire Marshal (December 5 to January 7, 1987), and additional delays after February 5, 1987 when Marriott had provided to McDevitt all necessary materials.

McDevitt's suggestion that there was a single delay to the critical path of the Project to which both parties contributed is not persuasive. The record demonstrates that there were numerous distinct delays, most of which occurred during built-in "float" time, that is, time periods during which delays would not affect the Project's critical path. Marriott met its obligation to provide information when it provided the electrical panel sketches, at the latest, on February 5, 1987. Even after February 5, there was additional "float" time. Final approval was not obtained until May 1, 1987. McDevitt, therefore, must bear sole responsibility for this almost three-month delay, which not only used all available "float" time, but also directly delayed the critical path for an additional brief period of time.

### II. MARRIOTT'S COUNTERCLAIM

Under the explicit terms of the Contract, McDevitt was required to complete this Project in time for Marriott to obtain a permanent certificate of occupancy by December 20, 1986. (PX–1, Art. 3.1). The Contract warns that Marriott "may suffer great financial loss if the Work is not completed by [that time]." (PX–1, Art. 3.3). McDevitt did not achieve the requisite stage of completion until May 1, 1987, or 132 days after the contractual deadline. (Barry, Tr. at 91). McDevitt's delay in completing the Project was not excused and, therefore, constitutes a breach of the Contract. (PX–2, Gen'l Conditions, Art. 7(A)). For this breach, Marriott seeks to recover damages in the amount of $513,-623. Specifically, the damages reflect Marriott's losses resulting from the hotel's delayed opening, namely, the delayed sale of the hotel and the expenditure of additional administrative costs during the extended construction period. As a result, Marriott (1) was deprived of the use of the sale proceeds for 132 days (DX–255); (2) did not receive ground lease payments (DX–257) or (3) lost management fees for that period (DX–260); and (4) incurred additional administrative costs (DX–259). The Court concludes that Marriott is entitled to $416,-823 as compensation for the delayed receipt of sale proceeds, lost ground lease payments, and certain administrative expenses. Each expense category is addressed in turn.

### A. *Lost Use of Sale Proceeds*

#### 1. Findings of Fact

On August 14, 1986, Marriott entered into a "Purchase Agreement" with the Courtyard by Marriott Limited Partnership (the "Partnership"). Under that Agreement, Marriott agreed to convey to the Partnership a fee simple interest in this hotel and 49 other similar complexes, as well as Marriott's leasehold interest in the real property upon which the 50 hotels were located. (DX–221, Art. 2.01, at 7). Marriott agreed to transfer ownership of this hotel, and all others which were still under construction at the time of the Purchase Agreement, upon their completion. (Palmer, Tr. at 898). In return, the Part-

nership agreed to pay Marriott a total of $7,745,000 for this hotel, $1,489,000 at "closing" and $6,256,000 at "settlement." (DX–221, Ex. B, at 56; Palmer, Tr. at 901). These specific amounts were fixed by the Agreement and not tied in any way to the actual dates of closing and settlement. (Palmer, Tr. at 900–901). The settlement amount was to be paid by the Partnership to Marriott in cash. The closing amount was to be paid either in cash or in the form of a Deferred Purchase Note at 9½% interest. (DX–221, Art. 2.03, at 7–8). At this hotel's closing, as for all other closings under the Purchase Agreement, the Partnership chose to pay the closing amount with a Deferred Purchase Note. (Palmer, Tr. at 1024–26). The fact that Marriott's records apparently reflect that cash was paid for the closing amount do not persuade the Court otherwise. (DX–223, at 1–2). The Court accepts the testimony of Mark Palmer, comptroller for Courtyard Management Corporation, that, based on his personal knowledge, a Deferred Purchase Note was paid at closing and Marriott's failure to indicate that fact on its records was simply a clerical error. (Palmer, Tr. at 1024–26).

Under the terms of the Purchase Agreement, settlement could not occur until a hotel was substantially completed. Substantial completion would occur when 80% of the guest rooms were ready for occupancy, the kitchen and restaurant were ready for use, and Marriott could certify that the hotel would be open for business within 60 days. (DX–221, Art. 6.01, at 36; Palmer, Tr. at 903–04). Closing had to take place before the hotel opened for business. (DX–221, Art. 2.12(b), at 14). As a prerequisite for "closing", Marriott was required to obtain an " 'as-built' survey prepared in conformity with American Land Title Association standards." (DX–221, Art. 4.06, at 34; Palmer, Tr. at 906, 1014–15). Closing, therefore, could not occur significantly before settlement because the "as-built" survey could not be obtained until construction was almost complete. (Palmer, Tr. at 906, 1017). Moreover, by the terms of the Purchase Agreement, interest did not begin to accrue on the Deferred Purchase Note

used to pay the "closing" amount until the settlement date. (Palmer, Tr. at 912; DX–223).

Closing and settlement on this hotel occurred simultaneously on April 15, 1987, and the hotel was completed on May 1, 1987. (DX–226; Palmer, Tr. at 920–21). Had the hotel been completed on time, closing and settlement would have similarly occurred simultaneously on or about December 5, 1986, approximately 15 days before the hotel's scheduled completion on December 20, 1986. (Palmer, Tr. at 963–69). There is no evidence that any other delays or complications would have prevented closing and settlement on December 5, 1986. Transfer of the hotel to the Partnership was therefore delayed from approximately December 5, 1986 until April 15, 1987. Had Marriott closed and settled on December 5, 1986, it would have had available the $6,256,000 in cash for an additional 132 days, from December 5, 1986 until April 15, 1987. This sum could have been used to pay down Marriott's corporate borrowings and to reduce its interest expense. Calculated at Marriott's average weighted borrowing rate, Marriott would have had available an additional $202,875. This is the standard rate charged by Marriott for carrying costs to capital projects. (DXs–229 through 234; Palmer, Tr. at 933–35). Also, Marriott would have enjoyed interest at a rate of 9½% on the closing amount of $1,489,000, for an additional $52,250. That interest, however, only began to accrue at settlement. (DX–223; Palmer, Tr. at 1028–31). Overall, Marriott lost approximately $265,125 from the delay in receiving the sale proceeds.

In the absence of any assertion by McDevitt to the contrary, the Court concludes that the damages sought by Marriott were reasonably foreseeable. The Contract clearly warns that "TIME IS OF THE ESSENCE OF THIS AGREEMENT. Owner may suffer great financial loss if the Work is not completed by the time specified in Section 3.1 hereof." (PX–2, Contract, Art. 3.3) (emphasis in original). McDevitt was, therefore, on notice that prompt completion of the Project was an

essential part of the agreement and that any unexcused delay would result in financial losses to Marriott.

### 2. Conclusions of Law

McDevitt's failure to complete the hotel on time is a breach of the Contract. Marriott, therefore, may recover those damages directly and naturally flowing from that breach,[6] as well as consequential damages, or those that arise from reasonably foreseeable special circumstances. *See In the Matter of Westinghouse Elec. Corp. Uranium Contracts Litigation,* 597 F.Supp. 1456, 1473–75 (E.D.Va.1984), *modified on other grounds by* 826 F.2d 239 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1574, 99 L.Ed.2d 890. (1988); *E.I. du Pont de Nemours & Co.,* 191 Va. at 572–73, 62 S.E.2d at 255. In general, the Court's guiding principle in awarding damages is to put the non-breaching party in the same position as it would have been with full and timely performance of the contract. *See Appalachian Power Co. v. John Steward Walker, Inc.,* 214 Va. 524, 201 S.E.2d 758, 767 (1974). In this Counterclaim, Marriott seeks both direct, out-of-pocket expenses and consequential damages.

In the case of a contractor's construction delay, the measure of damages under Virginia law is either the rental value of the completed structure for the delay period or a reasonable return for that period on the completed structure treated as an investment. *Roanoke Hospital Ass'n v. Doyle & Russell, Inc.,* 215 Va. 796, 214 S.E.2d 155, 161 n. 6 (1975); *Pennsylvania State Shopping Plaza, Inc. v. Oliver,* 202 Va. 862, 120 S.E.2d 372, 377 (1961). Where, as here, the construction delay involves a hotel with rooms rented separately each night, the rental value is admittedly difficult to measure. Marriott has, therefore, elected to seek damages under the latter formula. The rate of return for this Project may be measured, in part, by the foregone value of Marriott's use of the sale proceeds during the delay period. In August 1986, Marriott contracted to sell this hotel immediately upon its completion for a fixed amount. As a direct result of the delayed completion date, Marriott was denied the benefit of the contractually-fixed sale proceeds from December 5, 1986 to April 15, 1987. In total, Marriott lost approximately $265,125. (DX–255). This was a reasonably foreseeable loss caused by McDevitt's breach. Marriott is, therefore, entitled to recover the full $265,125.

### B. Lost Ground Lease Revenues

#### 1. Findings of Fact

On August 13, 1986, Marriott entered into a "Ground Lease" with Host Restaurants, Inc. ("Host"), a wholly-owned subsidiary of Marriott. Pursuant to that agreement, Host leased the property upon which the hotel is located to Marriott for 95 years, from August 13, 1986 through December 31, 2081. (DX–258, at 1, 8). The Ground Lease required Marriott as lessee to pay rent beginning on the day the hotel opened for business. (DX–258, at 9; Palmer, Tr. at 920). The rent due for each of the first five fiscal years of operation was a minimum of $133,000 (DX–258, Ex. A), or $2,558 per week. (Palmer, Tr. at 919, 960–61). Under the leasing agreement, the tenant was able to defer payment of the rent in the event it lacked sufficient funds after making required debt service payments. (DX–258, Art. 4.03). Host, however, earned interest on the deferred payments at the rate of two percent. (DX–258, Art. 4.03).

On April 15, 1987, Marriott assigned to the Partnership its interest under the Ground Lease. (DX–226). This assignment was made pursuant to the terms of the Purchase Agreement. (DX–221, Art. 2.13, at 15). The Partnership, therefore, was obligated to pay Host $2,558 per week once the hotel opened. Host's interests in these payments were, in turn, assigned to

---

6. *See Haass & Broyles Excavators, Inc. v. Ramey Bros. Excavating Co.,* 233 Va. 231, 355 S.E.2d 312, 315 (1987); *Roanoke Hospital Assoc. v. Doyle and Russell, Inc.,* 215 Va. 796, 214 S.E.2d 155, 160 (1975); *E.I. du Pont de Nemours & Co. v. Universal Moulded Products Corp.,* 191 Va. 525, 62 S.E.2d 233, 255 (1950).

Marriott, its parent company. Even absent the assignment, Marriott would have received the benefit of these payments because Host's results are reported on a consolidated basis with Marriott's. (Palmer, Tr. at 920).

### 2. Conclusions of Law

■ As a result of the delay in opening, Marriott did not receive any ground rent for the 19–week delay period. The loss of these rent payments constitutes a second aspect of the measure of the hotel's value as an investment during the delay period. *See Roanoke Hospital Ass'n*, 215 Va. at 802 n. 6, 214 S.E.2d at 161 n. 6. Even if the hotel had been completed on time and the rent payments deferred under the terms of the Ground Lease, Marriott would have still been entitled to full payment, as well as 2% interest, at a later time. This loss was reasonably foreseeable and attributable to McDevitt's breach. Marriott is, therefore, entitled to recover $48,640 for lost ground rent revenues.

### C. *Lost Management Fees*

#### 1. Findings of Fact

On August 14, 1986, Courtyard Management Corporation (CMC), a wholly-owned subsidiary of Marriott, agreed, pursuant to a "Management Agreement" with the Partnership, to manage and operate all 50 hotels, including this hotel, being sold to the Partnership. (DX–222, Ex. A). In return, the Partnership agreed to pay CMC a management fee, equal to the sum of three separate fee components: (1) a base management fee equal to 3% of the hotel's gross revenues; (2) a Courtyard management fee equal to 3% of the hotel's gross revenues; and (3) an incentive management fee equal to 15% of the hotel's operating profit. (DX–222, at 7–10, 24). In addition, the Partnership agreed to pay separately all expenses of managing and operating the hotel. (Palmer, Tr. at 915–16). CMC has assigned to Marriott its rights and interests in the management fees for the relevant delay period. (Palmer, Tr. at 917–18).

In December 1987, Marriott projected the hotel's anticipated gross revenues and operating profits, using average room rates and average occupancy rates. (DX–260; Palmer, Tr. at 943–44, 950–60). These averages were based on the hotel's actual occupancy rates during certain periods, the historical occupancy rates of other similar Marriott hotels in their early occupancy periods, and the experiences of other hotels opening at that time of year. (Palmer, Tr. at 947). According to these calculations, Marriott probably would have earned approximately $930,769 in gross revenue and $493,436 in operating profit. (DX–260). Predicated on these estimated figures, CMC would, therefore, have earned $111,900 in management fees. (DX–260).

### 2. Conclusions of Law

■ Although a close question, the Court ultimately concludes that Marriott is not entitled to recover any lost management fees. The calculations upon which the projected management fee claim is based—that is, the hotel's projected revenues and operating profits—are simply too speculative to permit recovery under well-established Virginia law. Marriott has failed to meet its burden to prove this aspect of damages with "reasonable certainty." *See Medcom, Inc. v. C. Arthur Weaver Co., Inc.*, 232 Va. 80, 348 S.E.2d 243, 248 (1986); *Carr v. Citizens Bank and Trust Co.*, 228 Va. 644, 325 S.E.2d 86, 90 (1985); *The Pebble Building Co. v. G.J. Hopkins, Inc.*, 223 Va. 188, 288 S.E.2d 437, 438 (1982). As *Mullen v. Brantley*, 213 Va. 765, 195 S.E.2d 696 (1973), and its progeny teach, Virginia law precludes recovery for anticipated or lost profits where, as here, the party seeking recovery is a new business. *See LaVay Corp. v. Dominion Federal Savings & Loan Ass'n*, 830 F.2d 522, 529 (4th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988); *Coastland Corp. v. Third Nat'l Mortgage Co.*, 611 F.2d 969, 977–78 (4th Cir.1979); *Mullen*, 213 Va. at 768–69, 195 S.E.2d at 700; *see also Pennsylvania State Shopping Plazas, Inc. v. Olive*, 202 Va. 862, 120 S.E.2d 372, 377 (1961); *Sinclair Refining Co. v. Hamilton & Dotson*, 164 Va. 203, 178 S.E. 777, 780

(1935). Although Marriott is not seeking lost profits *per se*, the lost management fee calculations are inextricably linked to, and a function of, Marriott's anticipated profits and gross revenues. And this hotel, like any new business, is undeniably "a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages." *Mullen*, 213 Va. at 768–69, 195 S.E.2d at 700. The fact that this particular hotel was one of a nationwide chain of similar hotels with proven track records does not change the result. Too many variables prevent confident reliance on the results of other hotels in other locations under other economic conditions. As the *Mullen* court noted, the profits of other franchises or even a national average "do not present a reasonable basis upon which to judge with any degree of reasonable certainty what the profits would have been" for a new franchise in a different location. *Id.*

The single significant factor distinguishing the case at bar from *Mullen* is the fact that this hotel, unlike the pizza parlor in *Mullen*, eventually opened for and continues to do business. Thus, it has an actual track record of revenues and profits for the periods immediately after the delay period upon which Marriott based, in part, its management fee projections. The Court ultimately concludes, however, that this single factor does not, under the circumstances at bar, demand a contrary result to that in *Mullen*. First, the record before the Court offers no indication what role, if any, that track record played in the damage calculations. Marriott presented no persuasive testimony or documentary evidence to explain the damage calculations. It produced no witness with personal knowledge of the underlying assumptions and no documents to explain how each predicate figure to the final projections was computed. Indeed, Marriott's single witness on this subject offered only his general impression of the basis for the calculations.[7] Such personal impressions, based largely on hearsay, are not enough to establish with any degree of reasonable certainty the hotel's projected gross revenues and operating profits on which the management fees were entirely based. Marriott is not, therefore, entitled to recover from McDevitt lost management fees for the delay period.

### D. *Additional Construction Administration*

#### 1. Findings of Fact

In addition to damages from the delayed sale, Marriott also incurred $103,058 in additional, out-of-pocket, administrative expenses as a direct result of the extended construction period from December 20, 1986 to May 1, 1987. (DX–259). This total figure consists of site administration, travel, site security, temporary telephone, field office supplies, and bonds and insurance expenses. Marriott's claim for "site administration expenses" of $63,958 reflects all expenses related to Marriott employees who oversaw the hotel construction site. (Humphries, Tr. at 801–02). That figure was calculated by subtracting the anticipated amount of site administration expenses incurred during an 11½ month construction

---

7. Marriott's witness, Mark Palmer, was designated by Marriott as its corporate representative pursuant to Rule 30(b)(6), Fed.R.Civ.P. A corporate representative pursuant to Rule 30(b)(6) is required to "testify as to matters known or reasonably available" to the corporation. At the time of his deposition, however, Palmer was unfamiliar with the underlying assumptions and specific calculations used by other Marriott employees to project Marriott's damage figures. Rather, he offered only general references to what figures might have been relied on to make those calculations. To prevent unfair surprise at trial, the Court limited his testimony to the scope of his deposition testimony. (Palmer, Tr. at 947–48). Where a corporation designates a Rule 30(b)(6) representative to testify on an issue such as damages, it is obligated to take steps to insure that the witness is knowledgeable on this subject. A party cannot offer a Rule 30(b)(6) witness who professes ignorance or testifies vaguely at his deposition, but at trial seeks to offer more detailed testimony based on information acquired subsequent to the deposition. *Cf.* Rule 26(e), Fed.R.Civ.P.; *Eastern Auto Distributors v. Peugeot Motors of America, Inc.*, 795 F.2d 329, 337 (4th Cir.1986) (testimony regarding damages limited to information filed in interrogatories and subsequent supplemental answers).

contract from Marriott's actual expenditures according to its cost records. (DX–225; Humphries, Tr. at 802–06). The resulting figure was then adjusted downward to reflect the actual salary of the general superintendent on this Project. The final claim of $63,958 is more than 30% less than the figure that would result from a calculation based on the actual salaries of the relevant personnel and the actual number of hours worked on the Project after December 20, 1986. (Humphries, Tr. at 827–30). Marriott also expended additional "travel costs", including the mileage expenses, tolls and meals for Marriott's superintendents. The $1,500 claimed represents an average cost, rather than the higher actual travel charges. (Humphries, Tr. at 807–08, 831–32). "Site security expenses" consist of Marriott's costs of hiring security guards to patrol the Project during construction. The guards' work began with the commencement of FF & E installation and ended when the Project was completed. (Body, Tr. at 722–23; Humphries, Tr. at 809–10). Here, that period was necessarily longer than usual because of McDevitt's delay. (Body, Tr. at 722–23). Marriott calculated the additional costs by subtracting the amount of the security contract (which was also approximately Marriott's average site security cost) from the actual costs incurred. The resulting figure was $33,000. (Humphries, Tr. at 809–10, 832–33; DX–259, Attachment C; DX–225). Marriott also incurred additional "temporary telephone costs" that were necessary to maintain the construction phone line at the Project site. (Humphries, Tr. at 839). Marriott incurred $1,200 in actual phone charges on this line from January through April 1987. (Humphries, Tr. at 810–11, 837–39). This figure does not include any costs incurred by Marriott's operations personnel who used a separate phone line. (Humphries, Tr. at 810–11, 837–39). An additional $1,300 in "field office supply expenses" includes the additional costs of leasing the field office copying machine, purchasing drinking water supplies, and miscellaneous office supplies. (Humphries, Tr. at 811; DX–259, Attachment D). And finally, "bonds and insurance costs" of $2,100 represent the additional costs to Marriott of builder's risk insurance for the delay period. (Humphries, Tr. at 813, 840; DX–259, Attachment F).

Marriott also claims that it incurred an additional $61,000 in regional/national allocation, overhead allocation, temporary utilities, and testing and inspection expenses. With respect to "regional/national allocation", the Court finds that this Project did not actually incur any additional out-of-pocket expenses due to the delay. The regional/national allocation refers to Marriott's overhead "pool" of Marriott's project managers, construction managers, and associated construction staff in Marriott's Architecture and Construction Division. (Humphries, Tr. at 813–14). Each Courtyard project is allocated a certain proportion of the total pool, approximately $5,000 per month for a twelve-month average. (Humphries, Tr. at 813–14). The allocation serves, in effect, as a prediction of the proportion of Marriott's support efforts that will be required for each project. Here, the four-month delay prevented Marriott's personnel from providing these services to other projects during the delay period and allegedly "cost" Marriott an additional $20,000. (Humphries, Tr. at 814–15, 823–24). The record, however, does not establish by a preponderance that any additional costs were actually incurred by this Project. (Humphries, Tr. at 814–15, 820–25). Likewise, additional "overhead allocation" expenses of $9,300 which Marriott seeks were not, the Court finds, actual expenses or out-of-pocket costs of this Project. (DX–259, Attachment H; Humphries, Tr. at 816–17, 825). These overhead expenses refer to a separate Marriott pool of indirect overhead costs for Marriott's Architecture and Construction Division and its supporting functions, including accounting, computer, legal and executive management services, that must be provided throughout the entire construction period. (Humphries, Tr. at 815–17).

Marriott's claim for $6,000 in additional "temporary utilities expenses" for utilities provided during February, 1987, is also not

well-founded. (Humphries, Tr. at 808–09). Under the Contract, McDevitt was obligated to have the requisite building systems ready for permanent power connection "[a]pproximately sixty (60) days prior to building turnover." (PX–2, Specs., Section 00800, Part 1.04). Marriott then became financially responsible for electric, water, and gas services "at the time of permanent connection." (PX–2, Specs. Section 00800, Part 1.04). Here, Marriott ultimately paid for utility costs for February, March and April, 1987, the 90–day period prior to the completion of construction. (Body, Tr. at 707–707(a); Humphries, Tr. at 808–09). Nothing in the Contract, however, limited Marriott's liability for permanent utility costs only to 60 days. The evidence does not, therefore, establish that these expenses were directly caused by McDevitt's delay.

The final category of site administration expenses claimed by Marriott are "testing and inspection costs" which represent the additional costs of hiring Meyer Associates for structural testing and support activities and Matrix Construction Co. for soils and concrete testing. (Humphries, Tr. at 812). The average cost for these services at similar Courtyard projects is $21,000. Here, $44,300 was spent. (Humphries, Tr. at 812; DX–259, Attachment E). Specifically, Marriott incurred an additional $25,700—$20,000 to Matrix and $5,700 to Meyer—for further testing of soils. (Humphries, Tr. at 841; Body, Tr. at 724–26). Marriott concedes that these expenses were not related in any way to McDevitt's delay. (Humphries, Tr. at 841).

### 2. Conclusions of Law

■ As a direct result of McDevitt's breach, Marriott incurred additional out-of-pocket administrative costs during the delay period. Certain of these administrative costs—including site administration, travel, site security, temporary telephone, field office supplies, and bond and insurance expenses—are recoverable as direct and foreseeable damages resulting from McDevitt's contract breach. *See Roanoke Hospital Ass'n v. Doyle & Russell, Inc.*, 215 Va. 796, 214 S.E.2d 155, 160 (1975); *cf. A & E*

*Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 671 (4th Cir.1986) (breach of contract damages limited to pecuniary loss), *cert. denied*, 479 U.S. 1091, 107 S.Ct. 1302, 94 L.Ed.2d 158 (1987); *The Pebble Building Co. v. G.J. Hopkins, Inc.*, 223 Va. 188, 288 S.E.2d 437, 438 (1982) (recovery of additional labor costs based on contractor's original bid allowed); *Reliable Elec. Co. v. Clinton Campbell Contractor, Inc.*, 10 Ariz.App. 371, 459 P.2d 98, 102–04 (1969) (overhead and supervision expenses awarded). Marriott is, therefore, entitled to recover from McDevitt $103,058 for the additional expenses of these construction administration costs.

■ Marriott, however, has not demonstrated by a preponderance of the evidence that the expense categories of temporary utilities, testing and inspection, regional/national allocation, and overhead allocation were directly attributable to McDevitt's breach or recoverable additional costs paid by this Project. First, Marriott was obligated by the strict terms of the Contract to pay utilities costs once permanent service had been connected. All that was required of McDevitt was that permanent service should occur approximately two months before completion. No provision was included to allocate expense responsibilities differently in the event the contractor provided permanent service connection ahead of schedule. And the terms of the Contract, drafted by Marriott, must be strictly construed against Marriott. *See Wellmore Coal Co. v. Powell Construction Co., Inc.*, 600 F.Supp. 1042, 1047 (W.D.Va.1984); *Graham v. Commonwealth of Virginia*, 206 Va. 431, 143 S.E. 2d 831, 834 (1965). In short, Marriott has not sufficiently established that the utilities expenses in February, 1987, were directly caused by McDevitt's delay. Accordingly, Marriott is not entitled to recover the claimed $6,000.

Second, the additional testing and inspection services were not directly attributable to McDevitt's breach. Rather, the additional expenses incurred by Marriott were the result of the Project site's soils condition problems. Undoubtedly Marriott spent

more money—in fact, more than double—on testing and inspection services for this Project than for other similar projects. Based on the record before the Court, Marriott has failed to demonstrate by a preponderance of the evidence that all or any identifiable portion of the additional expenses were specifically required as a direct result of a Contract breach by McDevitt.[8] Absent such proof, Marriott cannot recover.

And finally, Marriott has failed to establish that it incurred any out-of-pocket expenses with respect to this Project's actual, in excess of its allotted, share of the regional/national or overhead allocation pools. Absent proof of a demonstrated pecuniary loss, this alleged expense has not been established with any reasonable degree of certainty to justify recovery. *See A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d at 671; *Medcom, Inc. v. C. Arthur Weaver Co.*, 232 Va. at 87–88, 348 S.E.2d at 248; *Carr v. Citizens Bank & Trust Co.*, 228 Va. at 651–52, 325 S.E.2d at 90.

### III. CONCLUSION

In sum, the Court finds that McDevitt is entitled to recover from Marriott a total of $64,811.68, Marriott's agreed share of the costs of undercutting and filling in the north end of the Project site. And Marriott is entitled to receive from McDevitt compensation in the amount of $416,823, representing $265,125 for delayed sale proceeds, $48,640 for lost ground rent, and $103,058 in additional administrative expenses.

In so holding, the Court rejects McDevitt's claim that Marriott's recovery should be offset by the value of its use of disbursement monies withheld from McDevitt during the delay period. (Palmer, Tr. at 1038–40). Marriott was entitled, under the terms of the Contract, to withhold those monies from McDevitt pending McDevitt's strict compliance with the Contract's prerequisites to payment. The last contract payment Marriott made to McDev-

itt was on June 9, 1987, for $497,223. (Body, Tr. at 729). McDevitt did not submit to Marriott any further requests for payment after the June 9 payment. Nor has it submitted a final request for payment as required by the Contract. (PX–2, Gen'l Conditions, Art. 39(A); Body, Tr. at 730). McDevitt has provided to Marriott neither the warranties and guaranties required by the Contract, (PX–2, Gen'l Conditions, Art. 40(C); Body, Tr. at 735; DX–161), nor its full and final release of all liens arising out of the Contract, a contractual prerequisite to final payment. (PX–2, Gen'l Conditions, Art. 25(B); Body, Tr. at 735)). And finally, although the Project was substantially complete by May 1, 1987, (Barry, Tr. at 91), McDevitt had not yet completed other minor corrections to its work on the Project by as late as November 16, 1987. (DX–162; Body, Tr. at 736). Marriott was, therefore, entitled to withhold the $450,175 pending McDevitt's full compliance with its Contractual obligations.

The Court also rejects McDevitt's argument that Marriott's issuance of change orders and McDevitt's performance of that changed work from December 20, 1986 to May 1, 1987, precludes its recovery of delay damages for the time needed to perform the changed work. McDevitt has not sought any extension of time for the work ordered in those particular change orders, and the Contract bars such extensions unless they are expressly acknowledged in the change orders. (PX–2, Gen'l Conditions, Art. 17(B), at 16; Peters, Tr. at 378–80). Moreover, McDevitt has failed to produce any evidence to suggest that these change orders would have delayed completion had McDevitt been on schedule. The natural inference from the record before the Court is that Marriott issued the change orders during the delay period because McDevitt was belatedly performing its work in the relevant areas during that time. Had McDevitt been on schedule with its work, Marriott likely would have submitted those change orders before the

---

**8.** It is possible that these costs were incurred as a direct result of other breaches by McDevitt. Marriott, however, never introduced evidence establishing a linkage between such breaches and the additional testing and inspection costs sufficient to persuade the Court.

scheduled completion date. McDevitt has presented no persuasive evidence to suggest otherwise. Marriott is not, therefore, precluded from recovering damages due to McDevitt's contractual breach by delay.

And finally, the Court rejects McDevitt's claim for prejudgment interest on the $450,175 retainage at the rate of 10% per annum from June 5, 1987, to the date of judgment. Under Virginia law, this Court clearly has discretion to award prejudgment interest. *See* Va.Code Ann. § 8.01–382 (1984); *Gill v. Rollins Protective Services, Inc.*, 836 F.2d 194, 198–99 (4th Cir.1987). In the circumstances at bar, however, the Court declines to exercise that discretion. The Court finds that Marriott's retention was justified in view of McDevitt's failure to deliver to Marriott the required warranties, guaranties, releases, etc. and to complete all corrective work, both prerequisites to final payment. (PX–2, Gen'l Conditions, Arts. 19(A), 25(B), 39(A), 40(C); PX–1, Art. 5.2; DX–161; DX–162; Body, Tr. at 729–30, 735–36). The Court does not, therefore, award to McDevitt any prejudgment interest.

Based on the Court's findings and conclusions and the calculations set forth below, the Court hereby ORDERS Marriott to pay McDevitt a total of $98,163.68, as follows: